Gibson, Appellant, vs. Prudential Insurance Company of America, Respondent.

*November 9—December 4, 1956.*

For the appellant there were briefs by *Davis, Soquet & Cherney* of Green Bay, and oral argument by *Colburn G. Cherney*.

For the respondent there was a brief by *Everson, Ryan, Whitney & O'Melia* of Green Bay, and oral argument by *John C. Whitney*.

STEINLE, J. In either May or June, 1951, Kenneth L. Gibson, office manager of an industrial machine company at Green Bay, and then twenty-four years of age, consulted his family physician, Dr. Joseph Halloin, with reference to a swelling of his right testicle. The doctor told him that it was

a strain, administered penicillin, and recommended wearing of a scrotal support. Thereafter, Carl Treml, an insurance agent representing the defendant company, solicited Gibson for the sale of a policy of life insurance. On September 5, 1951, Gibson signed an application for a policy in the amount of $12,500. He requested the agent to date the policy October 1st for the reason that he was not ready to pay a premium at the time.

The agent submitted to Gibson a list of physicians for the physical examination in connection with the application, and Gibson selected Dr. E. S. Brusky. On September 12, 1951, Gibson presented himself at Dr. Brusky's office where he was examined. The examination consisted of two phases, one the taking of answers to questions contained in a form relating to history, and the other an actual physical examination. Gibson signed the statement containing the answers written by Dr. Brusky in response to the questions propounded to him on behalf of the company in the examination form, and after Gibson had certified that the answers were complete and true. Dr. Brusky signed the examination form with respect to his statements concerning the physical examination. In response to questions regarding history, Gibson stated that he had not consulted or been attended by a physician during the past five years; that he never had tumor, cancer, growth, muscle or bone or gland disorder, etc.; that he never had disorder of a generative organ, nor any indication of defect of urinary or generative organs; that he never had any indication of any physical disorder, defect, or infirmity. Dr. Brusky then made a physical examination of Gibson. He examined the applicant's height, weight, measurement of the chest, and blood pressure, heart, lungs, eyes, ears, abdomen, and generative organs, and recorded the results on the report form. The doctor observed a growth about the size of a goose egg on the applicant's right testicle. It was in the form of a tumor mass which had the appearance of a hydrocele. It was firm in consistency upon touch. When questioned by the examiner about

it, Gibson stated that it had not been giving him any pain or discomfort; that it had not increased or decreased in size; and that it had remained stationary in size. The examiner concluded that the condition was a hydrocele, and on the form submitted by the company, reported "Patient has rt. hydrocele, which should not affect insurable risk. Hydrocele is nonpainful & stationary in size." The examiner answered in the negative the question in the form which read: "In your opinion is this risk questionable because of any factor, such as presence or history of mental or physical defect, character, habits, or environment?" The report of the examination was forwarded to the defendant company and processed there. Relying on the information given by the examiner to the effect that the applicant had a right hydrocele which was nonpainful and stationary in size, and also relying upon the truthfulness of the answers of the applicant as reported in connection with his personal and family history, the application was approved.

On September 20, 1951, Gibson consulted Dr. Leonard C. Miller regarding the growth on the testicle. Gibson did not tell Dr. Miller that he had been to a doctor previously in regard to the condition. Dr. Miller observed that the testicle was enlarged, but that it was not tender. It was the size of a baseball and did not transmit light. Gibson told the doctor that he had first noticed it in June, and that the enlargement was progressive but was not painful. Dr. Miller concluded that it was not a hernia nor a hydrocele, but suspected that it was a malignant teratoma. The doctor told Gibson that the condition was serious and referred him to Dr. Max A. Grossman, a specialist in urology, for immediate surgery.

Dr. Grossman examined Gibson on September 20, 1951, and found a swelling of the right testicle of six-months duration. Gibson told him that it had increased in size particularly in the last three or four months, but that there was no tenderness. He also stated that he had consulted his family physi-

cian four months previously about it, and had been informed that it was a strain and was advised to wear a scrotum support. Dr. Grossman found no presence of hydrocele. He concluded that it was a teratoma. Surgery was performed by Dr. Grossman at a hospital on September 21, 1951. The tumor was removed, and was sent to a laboratory for microscopic examination. The report disclosed a malignant teratoma. Gibson remained in the hospital for a week and later returned to work.

After September 24, 1951, the policy of insurance was issued by the defendant and sent to the agent Treml who delivered it to Gibson on either October 2d or 3d, 1951. Gibson paid the quarterly premium at the time. Treml did not have contact with Gibson between September 5th and the date of the delivery of the policy. Gibson did not inform Treml that there had been any change in his health, or that he had received medical attention between the date of the application and that of the delivery of the policy. Treml noted no change in Gibson's physical appearance or condition. He received no information that Gibson was suffering from cancer.

In October, 1951, Gibson started taking X-ray treatments. In April, 1952, when Gibson presented himself to Dr. Miller complaining of difficulty in breathing, the doctor discovered that there was a cancerous growth which had spread from the testicle-tumor site to the shoulder. Later Gibson was treated at the Veterans' Hospital at Wood, Wisconsin, and at a cancer clinic at Detroit, Michigan. He died at a sanatorium at Denver, Colorado, on July 6, 1953, as a result of cancer of the liver and lungs.

At the trial Dr. Brusky testified in part as follows:

"The fact that he [Gibson] told me that this growth was stationary and that it did not cause him any discomfort was very significant. . . . The conclusion as to whether or not it was a hydrocele still refers back to the fact that it wasn't

increasing in size and it was nonpainful. In retrospect, if it were a hydrocele, it wouldn't have made any difference, but it might well make a big difference. Hydroceles by their very nature are nonpainful. . . . After my examination, I did not recommend that Gibson was an insurable risk. I recommended that from the basis that it was a hydrocele, that it was an insurable risk, but I did not recommend him to be accepted by that answer. They make up their own decisions as to whether he's acceptable or not. I only report the facts and the history. I did write on this report, 'Patient has a right hydrocele which should not affect insurable risk.' That is the hydrocele should not; no. There was nothing else that I discovered from my examination, that indicated that he wasn't an insurable risk."

Dr. Walter Carl Hausheer, defendant's associate medical director, and George A. Reinfurt, defendant's underwriter, testified in effect that if the applicant had revealed that he was attended by a physician in June, 1951, additional information from his physician would have been required; and that if he had revealed that he had been hospitalized on September 21, 1951, and had submitted to an operation for removal of a tumor in the right testicle; or if he had revealed that he was suffering from cancer; or if he had revealed that he had disorder of a generative organ or defect in the urinary or generative organ other than a hydrocele which had been stationary in size and nonpainful, the application would not have been approved in accordance with the customary practice of the defendant or insurance companies generally.

The plaintiff, Lolamae Gibson, contends as follows:

(a)    Dr. Brusky's statement in the examining physician's confidential report was, in effect, a declaration that the decedent was a fit subject for insurance under the provisions of sec. 209.07, Stats.

(b)    Under provision of sec. 209.07, Stats., the defendant company is estopped from raising any conditions which appear in the policy in view of the examination by the defendant's physician.

(c) The jury's finding that the representations of the decedent were not made with intent to defraud should be sustained.

(d) The court erred in refusing to exclude evidence following the medical examination of September 12, 1951.

Sec. 209.07, Stats., provides:

"ESTOPPEL BY REPORT OF MEDICAL EXAMINER, EFFECT OF FRAUD. If the medical examiner of any life or disability insurance company shall issue a certificate of health, or declare the applicant a fit subject for insurance, or so report to the company or its agent under the rules and regulations of such company, it shall thereby be estopped from setting up in defense of an action on a policy issued thereon that the insured was not in the condition of health required by the policy at the time of the issue or delivery thereof, unless the same was procured by or through the fraud or deceit of the insured. . . ."

The defendant company contends that:

(a) Sec. 209.07, Stats., is inapplicable for the reason that there was no certificate of health or declaration by the medical examiner that the applicant was a fit subject for insurance.

(b) Sec. 209.07, Stats., does not apply to radical changes in health appearing subsequent to a medical examination and prior to the issuance of the policy.

(c) As a matter of law the false statements of the applicant were made with intent to deceive the medical examiner and the company.

(d) The applicant's misrepresentations as to previous medical consultation or treatment having increased the risk as a matter of law and not being associated with the "sound health clause" defense, avoid the policy under sec. 209.06, Stats., regardless of sec. 209.07.

(e) The trial court did not err in admitting evidence of events occurring after the medical examination of September 12, 1951.

Sec. 209.06, Stats., provides in substance that no representation made by the assured shall be effective to defeat or avoid the policy, unless such statement, representation, or warranty was false and made with actual intent to deceive, or unless the matter misrepresented or made a warranty increased the risk or contributed to the loss.

The decisive issues for determination are whether the statements of the medical examiner in his confidential report to the defendant company, based upon information to him by the applicant and upon his own physical examination, constituted declaration that the applicant was a fit subject for insurance; and also whether the untrue statements of the applicant to the medical examiner upon which he and the company relied, were made with intent to deceive the company and induce it to issue the policy.

In *Frozena v. Metropolitan Life Ins. Co.* (1933), 211 Wis. 373, 247 N. W. 333, the medical examiner was called upon by the insurance company to characterize the risk as "first-class, average, doubtful, or poor." The examiner designated it as "first-class." It was determined that such statement constituted a declaration that the applicant was a fit subject for insurance. However, it was held that the company was not precluded from setting up the defense of fraud and deceit, and such defense was sustained on the ground that the applicant had fraudulently represented, when questioned by the medical examiner, that he had not consulted a doctor within the past five years, and that he had not suffered any stomach ailment, when in truth he had suffered severely and fairly continuously from pain and distress in the region of the stomach, and that he was conscious of such fact at the time when he made the misstatement in his application. The jury had determined that the misrepresentation was not made with intent to deceive the company and induce it to issue the policy. This court decided that the jury's verdict in such

particulars could not be sustained upon the record. It was said (p. 377) : "The findings of the jury preclude inadvertent failure to disclose, and we can discover no ground upon which a deliberate or intentional withholding of this information could be made without intent to deceive. *Monahan v. Mutual Life Ins. Co.* 192 Wis. 102, 212 N. W. 269."

In *Jespersen v. Metropolitan Life Ins. Co.* (1947), 251 Wis. 1, 27 N. W. (2d) 775, the trial court was of the view that all of the conditions were present to bring sec. 209.07, Stats., into operation, and submitted but a single question to the jury dealing with inquiry as to whether the misrepresentation was made with intent to deceive. There, the medical examiner by the answering of questions required to be answered by him in his report, certified to the applicant's weight, height, pulse, and blood pressure, and that he had found no evidence of impairment to the heart, brain, stomach, lungs, etc. Specifically he answered in the negative a question : "Did you, by thorough examination, . . . find evidence of disease or impairment?" It was held that such answers did not constitute a certification of health or declaration that the applicant was a fit subject for insurance. Mr. Justice WICKHEM, speaking for the court, said (p. 4) :

"We are of the view that the trial court was in error in this conclusion. The law applicable to the situation is stated in *Frozena v. Metropolitan Life Ins. Co.* 211 Wis. 373, 376, 247 N. W. 333. It is there said that 'where a medical examination is had *and a report made that the applicant is a fit subject for insurance,* an estoppel arises against the company in the absence of fraud or deceit practiced by the insured upon the medical examiner in order to induce a favorable report.' It is pointed out in the opinion that sec. 209.07 does not apply where a medical examiner merely enters his findings with respect to the physical examination and forwards them to the company without comment. In such situations sec. 209.06, avoiding the policy where an innocent misrepresentation increases the risk, is to be applied. *Demirjian v. New York Life Ins. Co.* 205 Wis. 71, 236 N. W. 566. In the *Frozena*

*Case, supra,* the medical examiner was asked to characterize the risk as 'first-class, average, doubtful, or poor' and he characterized it as 'first-class.' This amounted to a declaration that the applicant was a fit subject for insurance and brought sec. 209.07 into operation."

In the case at bar we are obliged to conclude that the statements of the medical examiner that the applicant's condition of hydrocele "should not affect insurable risk" and that "in his opinion the risk was not questionable because of any factor, such as the presence or history of . . . physical defect, etc.," amounted to a declaration that the applicant was a fit subject for insurance. We are unable to perceive substantial distinction in the purpose and effect of the question here compared to one which may have inquired: "In your opinion is the applicant a fit subject for insurance because of the presence or history of a physical defect, etc. ?"

However, as in the *Frozena Case,* for the reason of the fraud and deceit by the applicant upon the examiner and the company, and notwithstanding a declaration of the examiner that the applicant was a fit subject for insurance, the company was not estopped under sec. 209.07, Stats., from setting up the defense that the applicant was not in the condition of health required by the policy at the time of its delivery. There is no dispute that the applicant represented that he had not consulted with or been attended by a physician within five years of the application, when in truth, he had consulted his family physician about the swelling on the testicle only three or four months previously, and had received treatment. Nor is there dispute that the examiner relied upon the statement of the applicant in this regard when he made his diagnosis and report. There is no contradiction that the swelling had grown rapidly particularly during the three-or-four-month period immediately before the application was made,—in fact had grown from a small swelling in May or June to the size of a baseball on September 20th—although the applicant had

told the examiner that it had remained stationary, and that the examiner had relied upon such statement. Here, as in the *Frozena Case,* the jury determined that notwithstanding the untruthful answers, the same were not made by the applicant with the purpose of fraudulently inducing the examiner to make the report. It is inconceivable that a man of the apparent intelligence and ability of the applicant did not realize the significance of the untruthful statements made by him to the medical examiner in such regards. Certainly he ought to have been aware that if he had revealed his prior consultation with and treatment by a doctor concerning the very condition only three or four months previously, the examiner or the company would have communicated with such doctor about it, learning of the size of the growth when it was first treated, etc., and that upon ascertainment of the truth the company would not have issued the policy. The situation is comparable to that in *Monahan v. Mutual Life Ins. Co.* (1927), 192 Wis. 102, 108, 109, 212 N. W. 269, where it was said:

"The insured was a school teacher, a person of at least ordinary intelligence, and she undoubtedly knew that to reveal the fact that she was ailing with or threatened by appendicitis or any similar or allied disease, or any trouble which a reputable physician had diagnosed as appendicitis, would greatly endanger her prospects of securing an insurance policy upon her life, and the only sensible reason that can be assigned for her deliberate false answers was to keep her condition of health from the knowledge of the insurance company. If the circumstances of this case do not prove beyond doubt an actual intent to deceive, it is difficult to understand how such an intent may be proved in such cases. The insured is dead. She cannot be questioned. Her intent must be inferred from what she did under all the circumstances.

"We can conceive of no inference consistent with an innocent purpose on the part of the insured that can be drawn from these facts and circumstances. It is impossible to indulge the thought that her suppression of the damaging facts

was due to a lack of memory or mere inadvertence. Her illness was so recent, and the advice which she received from Dr. Pember concerning her health was of so grave a nature, that it must have given her more than passing concern and left an impression upon her mind and memory that could not have faded within a period of three weeks. We hold that the evidence discloses as a matter of law an actual intent on her part to deceive the defendant company."

Plaintiff on this appeal maintains that the failure on the part of the applicant to have stated that he had been to a doctor on one occasion, and the failure to reveal that the swelling had become progressively larger between the time of such visit and the examination, were not material representations to the examiner or to the company, and that the examiner had actually relied entirely upon his own examination which proved to be a mistaken diagnosis. We cannot agree. Similar contention was raised in the *Monahan Case, supra* (p. 109), and the court said:

"Respondent contends that the medical examiner for the appellant did not rely upon her statements, but relied entirely upon his own examination, and that therefore her statements are not material. This contention cannot be sustained. It is well known that insurance companies, in determining whether an applicant is a fit subject for insurance, rely not only upon a physical examination, but upon the history of the applicant so far as it has relation to the applicant's health. In *McGowan v. Supreme Court of Independent Order of Foresters,* 104 Wis. 173, 183, 80 N. W. 603, speaking of similar statements made by an applicant for insurance, this court said:

" 'All of the questions as to the health or death, or age at death, of the ancestors or brothers and sisters of the deceased, were material to the risk as matter of law, and the court should have so declared.' "

We are obliged to conclude that the untrue statements of the applicant were material, and were made with intent to defraud or to deceive, and that the medical examiner and the

company relied upon the same. Had truthful answers been given by the applicant, the policy would not have been issued.

In view of such conclusion, we deem it unnecessary to determine the other issues raised upon this appeal.

*By the Court.*—Judgment affirmed.