**Joanne PISTAS, Plaintiff–Appellant,**

v.

**NEW ENGLAND MUTUAL LIFE IN-SURANCE COMPANY,**
**Defendant–Appellee, Cross–Appellant,**

v.

**Yale H. LAUTER, Third–Party**
**Defendant–Appellee.**

No. 87–2038, 87–2251.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 25, 1988.

Decided April 8, 1988.

Eric F. Greenberg, L___ ___tt, Bowles & Radzius, Ltd., Chicago, Ill., for plaintiff-appellant.

J. Robert Geiman and David J. Novotny, Peterson Ross Schloerb & Seidel, Chicago, Ill., for defendant-appellee, cross-appellant.

Barry L. Kroll, Williams & Montgomery, Ltd., Chicago, Ill., for third party defendant-appellee.

Before CUMMINGS, CUDAHY, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

An insurance adjuster and onetime agent, three weeks after the removal of

90% of his stomach at the Mayo Clinic on account of cancer, applies for $200,000 of term life insurance. He signs an application denying that he has cancer. A physician signs a statement that he has examined the applicant and sees no signs of illness—despite the prominent unhealed incision from the operation. The insurance company issues the policy, believing the applicant to be in perfect health. But he is undergoing an experimental radiation-chemotherapy regimen, and within nine months is dead. The insurance company predictably declines to pay, reasoning backward from the cause of death to the falsity of the statements on the application. The widow then files this suit to recover on the policy.

The widow does not contest the falsity and materiality of the statements on the application and medical report—or the related and interesting fact that he checked into the Mayo Clinic under an assumed name. The parties have two theories about the report, which we need not explore: the insurer thinks that the deceased's brother appeared for the examination, while the agent who took the application thinks that the physician made it all up at the deceased's request; the widow has no theory about the bogus medical report. We begin and end with the divergent theories about the application, which contains (over the deceased's signature verifying the truth of the representations) a check in the "No" box to the printed question: "Any treatment for or consultation with a physician concerning a heart attack, a stroke or cancer (other than skin cancer) within the past 2 years?". One would think this bald lie the end of the matter. The district court did, granting summary judgment to the insurer.

The widow's theory is that the deceased revealed the truth to Yale Lauter, the agent who took the application. This is backed up by the affidavit of Curtis Yearwood, the deceased's business partner who applied for insurance at the same time. According to Yearwood, Lauter replied that he would "take care of the insurance." The widow insists that the deceased would have understood this as meaning that can-

cer is not material to the decision to underwrite life insurance. Then either the deceased checked the "No" box under the impression that the answer is irrelevant, or Lauter checked the boxes and induced the deceased not to review the answers before signing. In either event, the widow insists, the case comes within the rule in Illinois (whose law governs this diversity case) that an applicant who reveals the truth to the insurance agent is protected against the agent's errors in relaying that knowledge to the insurer. E.g., *Logan v. Allstate Life Insurance Co.*, 19 Ill.App.3d 656, 660–61, 312 N.E.2d 416 (2d Dist.1974) (collecting cases). George Pistas, the deceased's brother, added in an affidavit that George talked with Lauter by phone *before* Dean Pistas applied for insurance and told Lauter that Dean had cancer. (Lauter had met the deceased a few months earlier.)

The insurance company and agent Lauter (impleaded as a third party defendant) take a different view of the application. Lauter avers that the deceased lied about his health and that the application faithfully represents what he was told. This sets up a testimonial conflict about a potentially material issue. The insurance company has two theories: one is that the deceased lied to Lauter and deliberately checked the wrong box on the form; the other is that the deceased and Lauter, two participants in the insurance business, were in cahoots in attempting to milk some money out of an insurance company for the benefit of a dying insurance adjuster. (The record does not reveal whether Lauter still writes insurance for New England Life.)

Now one would think that this dispute, too, is irrelevant. The case seems to be covered by the principle "No harm no foul." The deceased was not just trying to get a cheap rate (say, by applying for a nonsmokers' policy, see *Smith v. North American Co. for Life & Health Insurance*, 775 F.2d 777 (7th Cir.1985)), when he could have had the same amount of insurance had he been willing to pay the correct rate. Then an agent's failure to transmit the truth deprives the applicant of the knowledge that he needs to protect himself

by taking out a different policy, which leaves uninsured someone who could be insured. Nothing of the sort happened here. A person under treatment for stomach cancer, told by his physician that the disease is terminal, is not insurable at any premium significantly less than the face amount of the policy. If Lauter had told Dean Pistas that New England Life would not write the policy, what could Pistas have done?

The widow replies that he could have obtained smaller policies that do not require physical examinations. She paints a picture of applications for 20 policies of $10,000 each, readily available to a young person (Dean Pistas was 25). The difficulty is the same one Pistas encountered—the questionnaire. We do not know of any policy of life insurance, however small, available without replying to a series of questions about health, including one about cancer. Certainly the record contains no indication that any company offers such policies. Neither, however, does it contain an affidavit that there are no such policies, and the subject is not one for judicial notice; it is not inconceivable that some firm offers policies without questionnaires, handling the adverse selection effect by limiting the pool of applicants (say, to employees of a given firm or members of an existing group). If New England Life bears the burden on this subject, the silence of the record prevents a resolution of the case on this line of reasoning. See *LHLC Corp. v. Cluett, Peabody & Co.,* 842 F.2d 928, 935 (7th Cir.1988).

 Perhaps because of this problem, the district court inquired into the deceased's good faith as well as into the statements that appeared on the application. The applicant must act in good faith toward the insurer, and the rule that information to the agent is as good as information to the insurer applies only if the applicant does so. *Tesluk v. Metropolitan Life Insurance Co.,* 130 Ill.App.2d 290, 294, 264 N.E.2d 566 (1st Dist.1970); see also *Meier v. Aetna Life & Casualty Standard Fire Insurance Co.,* 149 Ill.App.3d 932, 940, 103 Ill.Dec. 25, 500 N.E.2d 1096 (2d Dist.1986).

The district court concluded that on this record the deceased could not have acted in good faith. If he neglected to tell agent Lauter of the cancer, he was not acting in good faith; if he told agent Lauter and heard the reply that Lauter would "take care of the insurance" he also must have known that something was amiss. The deceased had been a full-time insurance adjuster for five years, and for one and a half years before that a life insurance salesman. He had to know that people with a terminal disease can't get $200,000 of life insurance and that the question about cancer was material. So, the district court concluded, whether the deceased told Lauter or not, he may not collect on the policy.

This resolves a factual question; "bad faith" is a state of mind. Therefore, the widow reasons, the case must be tried. But a party may resist summary judgment only by producing evidence from which a reasonable jury could draw the necessary inferences in her favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Speculation or an appeal to the jury's compassion does not carry the day. This record does not contain facts that would support any inference other than the one the district court drew. How could a jury infer that a professional in the insurance industry does *not* know that cancer is a material fact and that terminal cancer disqualifies an applicant from receiving life insurance? Unless the jury could infer that Dean Pistas was ignorant of such things, it could not conclude that he was acting in good faith, even if it believed (as Yearwood's affidavit says) that Pistas told Lauter about his affliction. The only inference it could draw was that Pistas believed that Lauter would do him a favor by trying to pull the wool over the insurer's eyes. If it worked, his widow would be $200,000 to the good; and if it failed, he would have lost nothing. Of course, if the jury should disbelieve Yearwood, then the widow must lose anyway.

Dying from cancer at age 25 is a terrible thing, and so is losing a spouse so early in life. Joanne Pistas may hope that a jury would be compassionate. But it is not the

function of the legal system to shift misfortune to the shoulders of those who were not responsible for it. New England Life did not cause or contribute to Dean Pistas's premature death, and it did not knowingly agree to underwrite his longevity.

This disposition makes it unnecessary to decide whether appeal No. 87–2251, New England Life's appeal against Lauter, invokes our jurisdiction. The district court dismissed the insurer's third-party complaint against Lauter, reasoning (correctly) that it became irrelevant once the insurer prevailed against the widow. The widow filed a timely appeal; New England Life did not appeal against Lauter within the 14 days allowed by Fed.R.App.P. 4(a)(3). It obtained from the district court a finding of "excusable neglect" and now defends its cross-appeal on the ground that it needn't have appealed at all. There are cross-currents in the cases, some saying that the initial notice of appeal gives the court jurisdiction of the whole case so that the subsequent appeal serves only a notice function (and Lauter had actual notice that New England Life wanted to reinstate the third-party action if the case should be returned to the district court), others saying that the court may not diminish the rights of a party unless someone files a timely notice of appeal with respect to that party (and the widow's initial notice of appeal did not put in issue any of the rights of Lauter). *In re Barnett,* 124 F.2d 1005 (2d Cir.1942) (Frank, J.), and *id.* at 1013–14 (L. Hand, J., dissenting), lays out the terms of the dispute, which is no better resolved today than it was in 1942. Compare *Bryant v. Technical Research Co.,* 654 F.2d 1337, 1341–43 (9th Cir.1981), with *Zapico v. Bucyrus–Erie Co.,* 579 F.2d 714, 725 (2d Cir. 1978). We need not take sides in this debate. The appeal against Lauter was conditional, and the condition (reversal of the main action) has not been satisfied. The appeal is defunct on its own terms, and we dismiss it as irrelevant.

Appeal No. 87–2251 is dismissed. On appeal No. 87–2038, the judgment is affirmed.