**WASHINGTON AREA CARPENTERS' WELFARE FUND et al., Plaintiffs,**

v.

**OVERHEAD DOOR CO., OF METROPOLITAN WASHINGTON, Defendant.**

Civ. A. No. 79–0097.

United States District Court, District of Columbia.

April 22, 1980.

Joseph Semo, Washington, D. C., for plaintiffs.

Carl L. Taylor, William T. Torgerson, Washington, D. C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

This case comes before the Court on cross-motions for summary judgment. Plaintiffs [Funds] are various pension, welfare, and trust funds for a local carpenters' union. They bring this action under § 502(f) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132, and § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, to compel defendant, Overhead Door Co. of Metropolitan Washington [Overhead] to allow Funds to audit its records relating to employee contributions and to recover unpaid contributions that Overhead allegedly was required to make pursuant to an agreement with the carpenters' union. Funds also seek auditor's fees, attorney fees, costs and liquidated damages provided for in the agreement. The union itself is not a party to this action.

The original collective bargaining agreement between Overhead and the Carpenters' District Council of Washington, D.C. in October 1969 was executed at a job site where two of Overhead's employees were working. According to Overhead, the union's representative told Overhead's president that he had to sign the agreement if the employees were to finish the job. Over-

head acknowledges that these employees soon after joined the union, and that one of its thirteen other employees at the time was already a member of the union. Pursuant to that agreement, since October 1969 Overhead has deducted union dues from the wages of these three employees and has paid contributions on their hours. Overhead's president states that he currently has 21 employees doing carpentry work, and that of the three employees referred to above, two have not worked as carpenters in over 10 years. He does, however, admit to re-signing the agreement in 1972 and 1976.

Funds have commissioned an audit of the payroll records of the three employees for whom contributions were made; this audit concludes that Overhead owes contributions approximating $14,000. Overhead disputes the accuracy of the audit in that it included hours worked by the employees but not as carpenters. It has refused to allow Funds to audit its records relating to other employees.

The parties have treated this contract as a "pre-hire" agreement, a type of agreement peculiar to the construction industry that may be entered into before all employees to be subject to it are hired, and before the union's membership encompasses a majority of the employees. Labor-Management Relations Act § 8(f), 29 U.S.C. § 158(f). This exception to the typical requirement that a union demonstrate majority support before it may bargain with management is an accommodation to the "transitory nature of the employer-employee relationship in [the construction] industry." *N.L.R.B. v. Irvin*, 475 F.2d 1265 (3rd Cir. 1973). In time the union must gain majority support if it expects to represent the employees, because only representatives of the majority may bargain with the employer. Act § 9(a), 29 U.S.C. § 159(a). Here, neither the union nor Overhead have petitioned for a representation election under 29 U.S.C. § 159(c), or taken any other steps to determine whether the union has achieved majority support.

Overhead contends that since Funds have not demonstrated majority support, the pre-hire agreement and the agreement within it to make contributions are not enforceable. Funds argue that the pre-hire agreement is enforceable as long as majority support has not been disproven, and that even if the pre-hire agreement is found to be unenforceable, Overhead still must make contributions for all employees to the trust funds, under the rule that an employer may not assert any defenses it has to a union contract against a trust fund.

I. *Enforceability of the Pre-Hire Agreement*

■ The parties agree that resolution of this issue turns on the proper application and interpretation of *N.L.R.B. v. Iron Workers Local 103*, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978). In that case, the Supreme Court held that where a union which admittedly lacked majority support attempted to enforce its pre-hire agreement by picketing, it was guilty of the unfair labor practice of picketing for recognitional purposes, a violation of 29 U.S.C. § 158(b)(7). In arriving at this result, the Court affirmed the decision of the National Labor Relations Board, noting that

\* \* \* Under the Board's view of § 8(f), a pre-hire agreement does not entitle a minority union to be treated as the majority representative until and unless it attains majority support in the relevant unit. Until that time the pre-hire agreement is voidable and does not have the same stature as a collective bargaining contract entered into with a union actually representing a majority of the employees and recognized as such by the employer.

*Iron Workers*, 434 U.S. at 341, 98 S.Ct. at 655.

The Court "concluded that the Board's construction of the Act, although perhaps not the only tenable one, is an acceptable reading of the statutory language . . ." *Id.*

Overhead relies on *Iron Workers* for the proposition that the pre-hire agreement is

818

unenforceable unless majority support is proven by Funds or the union. Funds asserts that the *Iron Workers* case is limited to the situation of attempts to enforce pre-hire agreements by picketing. This interpretation was espoused in *Eastern District Council v. Blake Construction Co.*, 457 F.Supp. 825 (E.D.Va.1978). The court in that case held that a pre-hire agreement, although terminable by either party at will, was enforceable, and was not in fact terminated until the employer gave reasonable notice of his intent to terminate. The employer's failure to comply with the agreement was held to constitute conduct manifesting such intent. *Id.* at 830. The court distinguished *Iron Workers*: ". . . that case dealt with the question of whether certain picketing was an unlawful labor practice and is not determinative on the facts of this case." *Id.* at 829. Relying on *Blake*, Funds argue that since Overhead has not manifested its intent to withdraw from the contract or shown that the union lacks majority support, but has signed subsequent agreements renewing the original one, it remains obligated to make contributions.

The *Blake* decision, however, was disapproved of in a recent well-reasoned decision of the United States District Court for the District of Nebraska, which relied extensively on *Iron Workers* to resolve a dispute very similar to the one at bar. The case of *Contractors, Laborers, Teamsters & Engineers Health & Welfare Plan v. Associated Wrecking Co.*, 484 F.Supp. 582 (D.Neb. 1980), like the instant action, involved a suit to recover sums the defendant allegedly owed to the plaintiff trust funds pursuant to a pre-hire agreement. In that case, as here, the defendant contended that the union never obtained majority support and that the agreement, therefore, was unenforceable. The plaintiffs apparently offered no evidence to the contrary.

The court in *Associated Wrecking* interpreted the Board's holding in *Iron Workers* as "that a § 8(f) agreement is 'noneffective,' and thus unenforceable if the union never thereafter obtains majority status,

and that, therefore, the employer may freely decide to ignore it until such time as majority status is obtained." *Associated Wrecking, Daily Labor Report* (BNA, Mar. 12, 1980), at D–2. It read the Supreme Court's holding in that case to mean "that a § 8(f) agreement was unenforceable until such time as the union achieves majority status." *Id.*

It is clear that all § 8(f) does is to allow employers of construction workers willing to enter into agreements with uncertified unions to do so without being guilty of unfair labor practices. Legislative history bears this out:

It was not the intention of the committee to require by Section [8(f)] the making of prehire agreements, but, rather, to permit them, nor was it the intention of the committee to authorize a labor organization to strike, picket, or otherwise coerce an employer to sign a prehire agreement where the majority status of the union had not been established. The purpose of this section is to permit voluntary prehire agreements.

104 Cong.Rec. 11308 (July 16, 1958) (remarks of Sen. John F. Kennedy).

A pre-hire agreement "is merely a preliminary step that contemplates further action for the development of a full bargaining relationship." *Ruttman Construction Co.*, 191 N.L.R.B. 701, 702 (1971). It "cannot be enforced, and can be unilaterally ignored or abrogated by the employer,[1] until such time as the union achieves majority status in the relevant unit." *Associated Wrecking*, at p. D–2. "The employer's duty to bargain and honor the contract is contingent on the union's attaining majority support at the various construction sites." *Iron Workers*, 434 U.S. at 345, 98 S.Ct. at 655.

While the union here could at any time petition the Board for a representation election, it has not chosen to do so. With no evidence of support except the acknowledgment that three of Overhead's employees (including two no longer doing carpentry)

1. Presumably, no matter how many times it is re-executed.

at one time joined the union, Funds in effect are asking the Court to presume that the union has achieved majority support and, consequently, that the agreement is valid. The Court cannot traverse that bramble path without falling into a bottomless mire of speculation. It is abundantly clear that support of a majority of workers at each construction site is a crucial element of enforceability, to be affirmatively demonstrated by the party bringing suit.[2] Funds have not satisfied their burden.

II. *Defenses to the Union Contract Applied to the Trust Fund Agreement*

■ Funds ask the Court to hold as a matter of law that when the trustees of a Taft-Hartley fund such as those involved here sue an employer for unpaid contributions, the employer may not assert any defenses it has against the collective bargaining agreement. They emphasize that the union is not a party to the suit and note in support of their argument various cases in which the courts have refused to allow employers to assert such defenses in suits brought by trust funds. Yet none of the cases cited by Funds involved a pre-hire agreement or the issue of majority support. *See Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960) (union breached contract by striking); *Huge v. Long's Hauling Co.*, 590 F.2d 457 (3d Cir. 1978) (union allegedly violated Sherman Anti-Trust Act); *Lewis v. Seanor Coal Co.*, 382 F.2d 437 (3d Cir. 1967), *cert. denied*, 390 U.S. 947, 88 S.Ct. 1035, 19 L.Ed.2d 1137 (1968) (antitrust violations and illegal "hot cargo" provisions in agreement alleged). These cases involved collateral defenses to enforcement of the agreements. The defense in the instant case, on the other hand, concerns the validity of the very agreement that sought to establish a contractual relationship between Funds and Overhead.

The laudable policy considerations behind the decisions disallowing contractual defenses in trust fund cases include guaran-

teeing "hard working people the unemployment, health and retirement protections that they and their families expect to receive as part of the terms of their employment" and foreclosing the "possibility that an employer will surprise its employees at a late date that it was not legally bound to provide for contingencies that may afflict them or their families in the future." *Huge v. Long's Hauling Co.*, at 465. These very important concerns, however, are absent in a case such as the instant one involving, as it does, a voidable agreement upon which no reasonable expectations of future benefits may be based. Certainly those employees who have never received benefits from the agreement can expect no more than the status quo.

The *Iron Workers* case teaches that majority support is a crucial element of an enforceable pre-hire agreement. Such support must be established affirmatively by the party suing to enforce the agreement. *Cf. Associated Wrecking, supra.* As majority support has not been shown, the agreement is unenforceable against Overhead. Consequently, Funds have no claim for insufficient contributions with respect to the three employees on whose behalf some contributions were made, nor any right to examine Overhead's payroll records for other employees.

In light of the foregoing, there being [as the parties agree] no genuine issues of material fact, Overhead is entitled to summary judgment as a matter of law pursuant to Fed.R.Civ.P. 56.

Judgment is entered for the defendant, Overhead Door Co. of Metropolitan Washington, in accordance with the accompanying Order.

---

**2.** The fact that the union is not a party to this suit does not relieve Funds of the burden to prove majority support. It is *proof* of majority support, not a representation election *per se*, that is required. While Funds may not be able to petition for a § 9(a) election, they are not precluded from presenting other forms of proof.