CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, a pension trust, et al., Plaintiffs–Appellants,

v.

GERBER TRUCK SERVICE, INC., Defendant–Appellee.

No. 87–2480.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 18, 1988.

Decided Aug. 25, 1988.

Reargued En Banc Feb. 9, 1989.

Decided March 17, 1989.

Albert M. Madden, Central States Law Dept., Chicago, Ill., for plaintiffs-appellants.

Ross A. Friedman, Susman, Schermer, Rimmel & Parker, St. Louis, Mo., for defendant-appellee.

Before BAUER, Chief Judge, and CUMMINGS, WOOD, Jr., CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

We took this case en banc to decide whether, when an employer and union submit to a pension fund documents promising to make contributions on behalf of all employees, understandings and practices that would prevent enforcement of the writings between employer and union also defeat the fund's claims. The answer depends on § 515 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1145, which provides:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

This means, we conclude, that a plan may enforce the writings according to their terms, if "not inconsistent with law". The pension or welfare fund is like a holder in due course in commercial law, see *Bonded Financial Services v. European American Bank*, 838 F.2d 890, 892–93 (7th Cir. 1988), or like the receiver of a failed bank, see *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987)—entitled to enforce the writing without regard to understandings or defenses applicable to the original parties. In so concluding, we follow our own opinion in *Robbins v. Lynch*, 836 F.2d 330 (7th Cir.1988), and the unanimous view of the other courts of appeals.[1]

I

James H. Gerber, who operated a trucking service as a proprietorship, wanted to expand his operations. Early in 1981 he bought the assets, including the operating authorities, of Fat's Express Truck Service. He hired its three drivers and other employees. The three new drivers, the "Fat's Three", were members of Teamsters Local

---

1. E.g., *Bituminous Coal Operators' Association, Inc. v. Connors*, 867 F.2d 625, 636 (D.C.Cir. 1989), ("Section 515 ends our inquiry with a determination of what is required by the written terms of the Agreement.... [T]he bargaining history ... is irrelevant" and discovery of such information is therefore unavailable); *Abbate v. Browning–Ferris Industries, Inc.*, 767 F.2d 52, 56 (3d Cir.1985); *Teamster's Local 348 Health and Welfare Fund v. Kohn Beverage Co.*, 749 F.2d 315 (6th Cir.1984); *Kemmis v. McGoldrick*, 706 F.2d 993 (9th Cir.1983); *Maxwell v. Lucky Construction Co.*, 710 F.2d 1395 (9th Cir.1983) (employer must make full contributions promised in agreement even though employer had paid, and could not recoup, an identical sum to another pension plan based on an oral agreement with union, and employees would get their benefits from that other plan); *Operating Engineers Pension Trust v. Beck Engineering & Surveying Co.*, 746 F.2d 557 (9th Cir.1984) (same as *Maxwell*); *Operating Engineers Pension Trust v.*

*Giorgi*, 788 F.2d 620 (9th Cir.1986) (fund entitled to full contribution promised outside of a collective bargaining agreement even though employer was required to, and did, make identical payments to another fund); *Southwest Administrators, Inc. v. Rozay's Transfer*, 791 F.2d 769 (9th Cir.1986) (employer must pay even if the agreement was induced by fraud); *Pierce County Hotel Employees Health Trust v. Elks Lodge*, 827 F.2d 1324 (9th Cir.1987); *Straub v. Western Union Telegraph Co.*, 851 F.2d 1262 (10th Cir.1988) (ERISA preempts state laws that would permit oral modifications); *Mo–Kan Teamsters Pension Fund v. Creason*, 716 F.2d 772, 777 (10th Cir.1983); *Trustees v. Pump House, Inc.*, 821 F.2d 566 (11th Cir.1987) (employer must pay even if the agreement was induced by fraud); *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir.1986) (oral modifications are forbidden by ERISA, 29 U.S.C. § 1102(a)(1)).

50 and had enjoyed pension and welfare coverage under multi-employer pension and welfare plans established by the Teamsters union and employers throughout the motor carrier business. The Fat's Three—two of whom were close to retirement age—wanted to keep that coverage. Gerber's other employees were not union members, and Gerber had no desire to pay union-scale wages to them or to the Fat's Three. He was willing to accommodate their desire to preserve pension and welfare coverage, however.

To achieve this objective, Gerber approached John Gonzales, the business representative of Local 50, with a proposition: Gerber would sign the Teamsters' collective bargaining agreement, if Gonzales would promise not to expect Gerber to do anything beyond making pension and welfare contributions on behalf of the Fat's Three. Gonzales found this acceptable, because it protected three union members who might otherwise get no coverage or have to search for new jobs late in their careers.

Gerber and Gonzales signed the National Master Freight Agreement and its Central States Area Local Cartage Supplemental Agreement, which required Gerber to make pension and welfare contributions on behalf of "all truckdrivers, helpers, dockmen, warehousemen, checkers, powerlift operators, hostlers, and such other employees as may be presently or hereafter represented by the Union". Because "representation" in labor law encompasses all bargaining-unit employees, this pledge reached well beyond the three who were *members* of the union. *Wallace Corp. v. NLRB*, 323 U.S. 248, 255–56, 65 S.Ct. 238, 242, 89 L.Ed. 216 (1944); *Emporium Capwell Co. v. Western Addition Community Organization*, 420 U.S. 50, 61–65, 95 S.Ct. 977, 984–86, 43 L.Ed.2d 12 (1975). Gerber and Gonzales signed a separate "Participation Agreement" requiring Gerber to contribute fixed sums per week to the pension and welfare plans on behalf of all "DRIVERS represented by the Union". "Drivers" was typed into a blank in a pre-printed form. The district court found after a bench trial that

[t]he collective bargaining agreement was modified by an understanding reached between Gonzales and Gerber only to extend Health and Welfare and Pension coverage to three employees.... James Gerber and John Gonzales both stated that the sole intent of the parties was to provide benefit coverage to [the Fat's Three]. Gerber and the employees established their own wages and other terms and conditions of employment. The Union did not seek to include any other employees in the [bargaining] Unit.

In other words, Gerber and Gonzales agreed that the documents they signed would not be enforced. They were not enforced. Local 50 treated Gerber as if it were a non-union firm. We shall assume that these oral understandings and practices would have frustrated any attempt by the Teamsters, or by Gerber's employees, to assert rights under the agreements as contracts.

Gerber and Gonzales did not inform the pension and welfare plans of their arrangement. They sent the collective bargaining and participation agreements to the funds. Gerber began to make contributions on behalf of the three drivers; he did not tell the plans that he employed additional drivers and other workers.

In June 1981 Gerber incorporated Gerber Truck Service, Inc., which assumed Gerber's obligations. Gerber Truck grew but continued to make contributions only on behalf of the Fat's Three. In August 1982 Gerber Truck informed Local 50 that it would not sign another collective bargaining agreement, but it did not send the union a written notice of withdrawal, and it continued making pension and welfare payments on behalf of the Fat's Three. One of the Three retired in September 1983, a second in August 1984. The third resigned from the union in April 1984, apparently because someone at Local 50 called his wife a bad name. Gerber Truck sent the funds a notice of termination and stopped paying.

This caught the attention of the plans, which audited Gerber Truck's books. The plans discovered that Gerber Truck had

drivers in addition to the Fat's Three and workers with other duties, a total of 18 additional employees apparently covered by the collective bargaining agreement. They opened pension and welfare accounts on behalf of the other employees, giving them credit for covered employment; the plans also demanded that Gerber Truck make contributions on behalf of these employees from February 1, 1981, when Gerber signed the documents, through March 31, 1985, the first contract anniversary after the written notice of cancellation. Gerber Truck refused, and this litigation followed. 29 U.S.C. § 1132(e)(1).

After finding that Gerber and Gonzales agreed that the written documents would be enforced only with respect to the Fat's Three, and then only to the extent they promised pension and welfare coverage— and that this oral restriction had been honored—the district court concluded that the pension and welfare trusts acquired no more than what Gerber and Gonzales had negotiated. The court ordered Gerber Truck to make full payments on behalf of the Fat's Three but otherwise rejected the plans' claims.

## II

■ The pension and welfare plans are not parties to the collective bargaining and participation agreements. Third-party beneficiaries usually take contracts as they find them. They get no more than the signatories provided, and if there is a flaw in the formation of the contract the third-party beneficiaries get nothing. See *Restatement (Second) of Contracts* § 309(1) (1981), stating that a voidable contract may not be enforced by the intended beneficiary, and § 309(3), stating that if the contract was properly formed "the right of any beneficiary against the promisor is not subject to the promisor's claims or defenses against the promisee". See also *Restatement (Second) of Contracts* § 311 (1979), and *Price v. Pierce*, 823 F.2d 1114, 1119 (7th Cir.1987), both pointing out how the presence of a third-party beneficiary can prevent modification of the contract, once it is properly formed.

■ Multi-employer pension and welfare plans would be in a bind if this familiar rule applied, so that flaws in the formation cut off third-party claims. Plans rely on documents to determine the income they can expect to receive, which governs their determination of levels of benefits. Multi-employer plans are defined-contribution in, defined-benefit out. Once they promise a level of benefits to employees, they must pay even if the contributions they expected to receive do not materialize—perhaps because employers go broke, perhaps because they are deadbeats, perhaps because they have a defense to the formation of the contract. If some employers do not pay, others must make up the difference in higher contributions, or the workers will receive less than was promised. *Lynch*, 836 F.2d at 333. Costs of tracking down reneging employers and litigating also come out of money available to pay benefits. The more complex the litigation, the more the plan must spend. Litigation involving conversations between employers and local union officials—conversations to which plans are not privy—may be especially costly, and hold out especially great prospects of coming away empty-handed. How is a pension fund to overcome a jointly advanced claim that there were oral exceptions to the documents?

Costs of this nature would not be large in an industry populated by a few mammoth firms, for then the funds could participate in the formation of the contracts and observe their performance. Many industries with multi-employer plans, including trucking, construction, and mining, are characterized by thousands of small firms, however. Multi-employer plans cover hundreds of local unions.

Our pattern must be common: An employer wants some of its employees to have pension and health benefits, and others not. Some may be only a few years away from vesting. Pension and welfare trusts, like insurers generally, want to avoid "adverse selection", the dropout of persons safer or younger than the pool's average. Funds insist that members of a group be in or out as a bloc: the fund cannot cover the old

and infirm at a rate computed from group averages while receiving nothing on behalf of younger employees. Employers often strongly wish it were otherwise. Local unions may not care about selective inclusion in pension plans (since the costs are borne by employers in other parts of the country), and from their perspective having some workers covered is better than having none. So the local and the employer sign a collective bargaining agreement and send it to the pension and welfare trusts. Seeing documents apparently in order, the plans accept the tendered contributions. Later the plans discover the partial payment and try to recover the balance. The employer resists on the ground that it did not "really" agree to do what the documents say. Or the employer may say that the local union induced its signature by fraud, or did not keep its part of the bargain, or was not authorized to represent the employees, or a dozen other lines of defense.

Early in the history of multi-employer pension and welfare plans, the Supreme Court established that breach by the union would not relieve the employer of its obligation to make pension contributions. *Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 469–71, 80 S.Ct. 489, 495–96, 4 L.Ed.2d 442 (1960). The Court observed that the trusts have independent obligations to workers, and that if one employer drops out on account of a union's misconduct (in *Benedict*, a strike), other employers must make up the difference, or the funds will default. *Lewis* did not address defenses to the formation of the contract, however, and employers continued to press them, putting plans to high costs of litigation and risk of failing to collect.

Congress added § 515 to ERISA in 1980 to deal with these collection problems. Two cases in particular caught the eye of the sponsors: *Washington Area Carpenters' Welfare Fund v. Overhead Door Co.*, 488 F.Supp. 816 (D.D.C.1980), and *Western Washington Laborers–Employers Health & Security Trust Fund v. McDowell*, 103 L.R.R.M. 2219 (W.D.Wash.1979). Each of the employers signed an agreement common in the construction business, promis-

ing to recognize the union and adhere to the collective bargaining agreement as soon as it had hired its complement of employees for the job. "Pre-hire" agreements avoid the need to negotiate separately for each project when the employer assembles a new labor force for each site, sometimes from day-to-day. The Supreme Court held in *NLRB v. Bridge Workers*, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978), that pre-hire agreements are valid only if a majority of those ultimately hired wish to be represented by the union. Employers predictably repudiated pre-hire agreements for many construction jobs and refused to make pension and welfare contributions. *Overhead Door* and *McDowell* held that because the union's failure to achieve majority status prevented the pre-hire agreement from coming into force, the employer was relieved of obligations to pension and welfare funds. As the court put it in *Overhead Door*, 488 F.Supp. at 819: "These cases [such as *Lewis*] involved collateral defenses to enforcement of agreements. The defense in the instant case, on the other hand, concerns the validity of the very agreement that sought to establish a contractual relationship between Funds and Overhead." *Overhead Door* drew the same distinction as the *Restatement (Second) of Contracts* between defenses to formation, which cut off third-party beneficiaries' claims, § 309(1), and defenses arising out of the course of performance, which do not, § 309(3).

The multi-employer amendments to ERISA in 1980 were enacted without the usual committee reports. The managers of the legislation made up for part of the omission. The manager in the House stated on the floor:

Because delinquencies of employers in making required contributions are also a serious problem for many multiemployer plans, we wish to make clear the public policy in this area, which this bill is intended to further. Failure of employers to make promised contributions in a timely fashion imposes a variety of costs on plans. . . .

These costs detract from the ability of plans to formulate or meet funding standards and adversely affect the financial health of plans. Participants and beneficiaries of plans as well as employers who honor their obligation to contribute in a timely fashion bear the heavy cost of delinquencies in the form of lower benefits and higher contribution rates....

Recourse available under current law for collecting delinquent contributions is insufficient and unnecessarily cumbersome and costly. Some simple collection actions brought by plan trustees have been converted into lengthy, costly, and complex litigation concerning claims and defenses unrelated to the employer's promise and the plans' entitlement to the contributions. This should not be the case. Federal pension law must permit trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law—other than 29 U.S.C. 186. Sound national pension policy demands that employers who enter into agreements providing for pension contributions not be permitted to repudiate their pension promises.

In this regard we endorse judicial decisions such as *Lewis v. Benedict Coal Corp.*.... Cases such as *Western Washington Laborers–Employers Health and Security Trust Fund v. McDowell* ... and *Washington Area Carpenters' Welfare Fund, et al. v. Overhead Door Company* ... are considered to have been incorrectly decided and this legislation is intended to clarify the law in this respect by providing a direct, unambiguous ERISA cause of action to a plan against a delinquent employer.

126 Cong.Rec. 23039 (Rep. Thompson). Senator Williams, the manager in the Senate, read into the record the third and fourth paragraphs of Rep. Thompson's statement, *id.* at 23288. The first three paragraphs of Rep. Thompson's statement appear verbatim in a Senate committee print explaining the scope and effects of the pending bill. Senate Committee on Labor & Human Resources, *S. 1076—The Multiemployer Pension Plan Amendments Act of 1980: Summary and Analysis of Consideration*, 96th Cong., 2d Sess. 43–44 (April 1980).

■ The text of § 515 is adapted to its purpose, making promises enforceable "to the extent not inconsistent with law". If the contract provides for the commission of unlawful acts, it will not be enforced. *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 86–88, 102 S.Ct. 851, 861–62, 70 L.Ed.2d 833 (1982). If the employer simply points to a defect in its formation—such as fraud in the inducement, oral promises to disregard the text, or the lack of majority support for the union and the consequent ineffectiveness of the pact under labor law—it must still keep its promise to the pension plans.

Anything less may well saddle the plans with unfunded obligations. The pension and welfare trusts involved in this case gave all of Gerber Truck's employees credit for years of service, even though Gerber Truck paid only for the Fat's Three. Pension plans believe that their obligations to employees stem from the terms of the participation agreements, and that employers' failure to fulfill their promises is irrelevant. The Department of Labor, which administers ERISA, has issued advisory opinions to this effect on the authority of §§ 202–04 of ERISA, 29 U.S.C. §§ 1052–54. See Opinion 76–89 (Aug. 31, 1976), Opinion 78–28A (Dec. 5, 1978). *Central States Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 567 n. 7, 105 S.Ct. 2833, 2838 n. 7, 86 L.Ed.2d 447 (1985), refers to this position with apparent approval. (The question was not involved in *Central Transport*, however, so the status of these advisory opinions remains an open question.)

Whether or not the plans are obligated to Gerber Truck's workers, nothing in ERISA makes the obligation to contribute depend on the existence of a valid collective bargaining agreement; the repudiation of cases such as *McDowell* and *Overhead Door* shows the opposite. Section 515 interacts with a provision of the labor laws in a way that strengthens its effects. No

employer may agree with a union to contribute to a pension plan without a "written agreement" under § 302(c)(5)(B) of the National Labor Relations Act, 29 U.S.C. § 186(c)(5)(B). This need not be a formal collective bargaining agreement, *Gariup v. Birchler Ceiling & Interior Co.*, 777 F.2d 370, 375 (7th Cir.1985). Local 50 and Gerber signed and sent to the plans a participation agreement, separate from the collective bargaining agreement, in which Gerber promised to contribute on behalf of all of its drivers. Section 302(c)(5)(B), like § 515, prevents a court from giving force to oral understandings between union and employer that contradict the writings. E.g., *Mo–Kan Teamsters Pension Fund v. Creason*, 716 F.2d 772, 777 (10th Cir.1983); *Waggoner v. Dallaire*, 649 F.2d 1362, 1366 (9th Cir.1981). So ERISA and NLRA work together rather than at cross purposes.

Gerber Truck asks us to give § 515 the least possible scope because its arrangement with Local 50 so clearly negated the presence of a collective bargaining agreement. It implies that the pension plans would not bear high costs of litigation if they would recognize the obvious and desist from litigating. Costs always can be held down by accepting defeat in advance. But a legal system in which the Gerbers of the world can avoid their commitments creates opportunities for similar firms. One is obvious: write a broad contract and claim later that it "really" meant something else, if employees do not qualify for benefits. If they qualify, the employer pays; if not, it doesn't. This is strategic behavior, and sifting strategic from ingenuous conduct through the tools of litigation will be difficult (and time consuming, and expensive, and error-prone). *Kemmis v. McGoldrick*, 706 F.2d 993, 996 (9th Cir.1983). Defenses based on fraud in the inducement, oral side agreement, course of performance, want of consideration, failure of the union to have majority support—the sort of defenses Gerber Truck's position would make available—are as a class the defenses *most* likely to breed litigation even when asserted in good faith, and they create manifold opportunities for manipulation by crafty operators.

Administrative problems and litigation costs, although stressed in the legislative history, are not the only effects plans fear. Gerber and Gonzales tried to arrange things so that Gerber would not need to make contributions on behalf of employees who did not expect to receive benefits. Gerber would support the expectations of two employees close to retirement but introduce no young employees into the plans. Yet pension and welfare plans are insurance vehicles. Insurers *depend* on receiving contributions from persons who collect far in the future or not at all.

Collective bargaining agreements may call for, say, an annual contribution of $2000 on behalf of each employee for medical coverage.[2] The trust pays only if the employee needs care. Older employees need more care, on average. If employers can put only their oldsters, or those who actually need hospitalization, into the plan, the assumptions do not hold. A retirement plan is the same. A defined-benefit plan promises a specified benefit at retirement age after, say, 10 years of work. Computations underlying such a plan include two important assumptions: (a) many persons who work in the industry, and have contributions made on their behalfs, will never collect because they do not satisfy the vesting rule (they may quit or die before doing so); (b) many persons who qualify for pensions will work more than ten years. These two categories of workers fatten the pot and support the benefit levels. Gerber was trying to have only those who will qualify for pensions contribute to the fund. Yet without contributions on behalf of others, the plan's assumptions are unsound. Cf. *Stinson v. Ironworkers District Council Benefit Trust*, 869 F.2d 1014, 1016, 1021

---

**2.** The participation agreement Gerber signed required it to pay $51.00 per week per employee to the pension fund and $39.50 per week per employee to the health and welfare fund starting April 1, 1981, a total of $4525 per employee per 50–week year. (The weekly contributions before April 1 were slightly lower.) Contributions did not depend on the age or health of the employees.

–1022 (7th Cir.1989).

In a defined-contribution plan, no other employee (or employer) loses anything if a firm such as Gerber Truck neglects to pay. It is easy to match the payments in and the payments out, to say that those who will not receive anything need not pay in. For a defined-benefit plan, however, there is no such matching. The scheme works only if the plan receives contributions on behalf of persons who will not get benefits.[3] These characteristics of multi-employer defined-benefit plans may well account for the unwillingness of other circuits to allow an employer to achieve partial coverage of its work force, as Gerber Truck frankly wants to do.

Nothing depends on proof that a given plan will be unable to satisfy its obligations if a given employer avoids payment. Actuarial computations are the *reason* plans want to include or exclude bargaining units as groups, but this reason is the basis of a rule. A life insurance company may offer a plan for non-smokers only, computing its rates on the basis of actuarial tables applying to non-smokers. If a smoker should lie about his habit and enroll in the plan, a court could not permit him to stay—or to require the insurer to pay up—simply because he died in a plane crash rather than from lung cancer, or because payment of his claim would not bankrupt the plan. He would be booted out (or, if he had died, the insurer would be excused from payment) on the ground that he did not meet a contractual requirement of admission. Just *why* the insurer imposed this requirement

would not be the measure of its entitlement to enforce its rules. *Smith v. North American Co. for Life & Health Insurance,* 775 F.2d 777 (7th Cir.1985). So too with pension and welfare trusts. No matter why the plans have a rule of all-in-or-all-out, they have it, and an employer must play by the rules.

We recognize that the upshot may be harsh. Had Gerber known that Gonzales could not keep his pledge to withhold enforcement, he would not have signed; the cost of covering the Fat's Three would have been too steep. Section 515 does not admit of such an equitable defense; there is a wide gap between an "inequitable" result and an "illegal" one. More, Gerber's position is not all that "equitable". Gerber signed documents promising to make contributions on behalf of all bargaining-unit employees (in the collective bargaining agreement) and all "drivers" (in the participation agreement). He knew when he signed that he did not plan to live up to his commitment. Gerber Truck's defense is essentially that if the employer signs with its fingers crossed behind its back, it does not "really" agree to remit, and what it doesn't agree to do it needn't.

If Gerber and Local 50 had approached the pension and welfare trusts and said: "We want to continue the benefits for the Fat's Three, without making contributions on behalf of the current employees of Gerber", the funds would have replied "No."[4] It would be a poor rule that allowed persons to do in secrecy what they could not do openly. Gerber and Gonzales sent the

---

**3.** The nature of multi-employer plans makes the problem worse. A single-employer defined-benefit plan has a claim on all of the employer's assets to make good the promised benefits. A multi-employer plan is a defined-contribution plan from the employer's perspective (the employer promises to pay so much per week per employee) even though it is a defined-benefit plan from the worker's perspective (the plan promises to pay so much per year's employment, whether or not employers as a group contribute enough to make good the promise). The employer, seeing the disjunction between the nature of its promise and the nature of the plans' promise, tries to scrimp on contributions.

**4.** Whether it would have been impossible to accomplish the arrangement some other way is

a tougher question. Perhaps Gerber could have formed a subsidiary and placed the former Fat's employees in it, then negotiated a collective bargaining agreement on behalf of the subsidiary. It is hard to say whether such an arrangement could have succeeded. Using their power under Article IV § 9 of the Pension Fund Trust Agreement, the trustees have declined to "split" bargaining units to allow partial coverage. The Fat's Three might not have been doing distinctive work, preventing Gerber from handling their business as a subsidiary while observing corporate forms, or the NLRB might have ruled that they were not a logical collective bargaining unit.

plans two documents containing promises neither intended to honor. The district court allowed the stratagem to succeed *precisely because it was a sham*—because it did not even amount to a collective bargaining agreement. Gerber doubtless acted with the interest of his three older employees at heart. But the employer's wish to set the terms on which he will deal with a pension trust is not a self-fulfilling prophesy.

The district court did not address the question whether the reference to "drivers" in the participation agreement establishes the measure of the plans' entitlements, or whether instead the plans could collect contributions on behalf of the larger class of employees mentioned in the collective bargaining agreement. That question is open on remand.

### III

The district court held not only that Gerber Truck's obligations were limited to the Fat's Three but also that even with respect to them—and presumably with respect to any others—Gerber Truck's undertaking ended in 1982 when it told Local 50 that it would not sign a new collective bargaining agreement. Both the collective bargaining agreement and the participation agreement permit a party to terminate; both, however, require the notice to be in writing and provide that in the absence of such notice the agreement is automatically extended from year to year. Gerber's statement that he would not sign another agreement, even if taken as a notice of termination of the existing agreement (dubious at best), is ineffectual because not in writing.

The first writing came in May 1984, when Gerber sent the funds a letter stating that because the last of the Fat's Three had resigned from the union, Gerber Truck would make no further contributions. This writing did not purport to cancel the collective bargaining agreement, however, and so it too was ineffectual. In November 1984 Gerber Truck finally gave a notice that complied with the collective bargaining and participation agreements. These provide that cancellation takes effect on an anniversary date, in this case March 31, 1985. Gerber Truck therefore had to contribute to the pension and welfare funds, under the terms of the participation agreement, through the end of March 1985.

 One final issue wraps up the case. The plans sought liquidated damages and attorneys' fees on the authority of § 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2). Although the district court awarded the plans their attorneys' fees, it declined to impose liquidated damages or other penalties because it found that there was a legitimate dispute about the extent of Gerber Truck's obligations. This is not the legal standard established by § 502(g)(2), however. Awards of liquidated damages are "mandatory in an action in which judgment in favor of the plan is awarded." *Gilles v. Burton Construction Co.*, 736 F.2d 1142, 1144 (7th Cir.1984). Liquidated damages compensate the plans for delay and give employers an incentive to be forthcoming with payments. The structure of the multi-employer amendments of 1980, of which § 502(g)(2) is a part, is pay-now-argue-later. Even on the district court's view of the case, the pension and welfare trusts were prevailing parties. The district court must add the penalties provided by § 502(g)(2) to whatever sums it ultimately awards to the plans as past-due contributions.

The judgment is reversed, and the case is remanded for further proceedings in accordance with this opinion.

CUDAHY, Circuit Judge, with whom WOOD, Jr., Circuit Judge joins, concurring in part and dissenting in part:

The majority opinion is long on legal, economic and actuarial theory and short on facts and a sense of proportion. This case was originally heard by a unanimous panel that required Mr. Gerber to make contributions through the end of March 31, 1985, and to pay liquidated damages and attorneys' fees (as reiterated in Part II of the majority *en banc* opinion), but confined the required contributions to those on behalf of the "Fat's Three." The panel, however,

required Gerber, in order to escape the broader liability now imposed by the *en banc* court, to prove to the district court that "no employee (other than the Fat's Three) has a colorable potential claim to benefits from the [pension and welfare] Funds and that no employee has ever had a reasonable basis for believing himself entitled to make such a claim." Only if Gerber could make such a difficult and demanding showing, would the panel relieve him of the broader obligations purportedly owed on behalf of the other employees pursuant to the written documents. I rely principally on the panel opinion, 854 F.2d 1074 (7th Cir.1988), as furnishing an alternative—and fairer—solution of this difficult problem. I note that the conditions imposed by the panel opinion are so rigorous and virtually impossible of fulfillment in the general case that it is hardly a precedent for the chicanery the majority purports to foresee.

This case is quite atypical, however. Gerber was a truck driver [1] who acquired Fat's trucking business as a sole proprietor and with it the Fat's Three. Fat's had been a party to the 1979–1982 National Freight Agreement, which, among other things, entitled the Fat's Three, who were members of Teamsters' Local 50, to employer-paid health and pension benefits administered by the plaintiff funds. Gerber had no intention of conducting a unionized operation but apparently generously sought to continue pension and health benefits for the Fat's Three (two of whom were approaching retirement age). Gonzales, the union business agent, testified that neither party intended anything but benefits specifically for the Fat's Three. There is no evidence in the record that anyone, including any Gerber employee, had any other understanding.

ERISA does not repeal basic contract law. What was intended and agreed to was not a collective bargaining agreement since it did not give the parties or any employees who knew about it any rights beyond the specific, limited benefits to the Fat's Three. This, of course, does not

mean that Gerber did not have problems with the Funds based on ERISA and the written documents which he ill-advisedly signed—on a sort of estoppel principle—but it is simply incorrect to say that the "contract" amounted to anything more than what *both* parties unequivocally intended and to what they testified. In this respect, this case is different than any other I have seen. Typically, in these cases, an employer signs a broad agreement (which is unarguably a "collective bargaining" agreement), the union hopes he will perform and the employer later cuts corners, with or without the union's tacit consent. Here the intention of both union and employer was clear from the very start. The employer reinforced their understanding by securing health insurance for his other employees from another source. The implication of the majority that Gerber acted with sinister motives or possibly engaged in "strategic behavior" is preposterous. Gerber was a truck driver, unassisted by lawyers and accountants, who apparently sought nothing more sinister than to keep in force the pensions of three older employees who came to him from a failed firm. He may have erred in attempting to accomplish this by using the National Master Freight Agreement form, but the district court did not find, nor does the record disclose, that he was attempting to cheat or mislead anyone. And the majority opinion is totally off base in its charge that Gerber failed to "live up to his commitment." In the view of the union and of Gerber's employees, as well as of Gerber himself, his only commitment at any time was to the Fat's Three.

The majority opinion fails to clarify one very puzzling aspect of the written documents. The majority notes the rather broad description of job categories covered by the Master Agreement ("all truckdrivers, helpers, dockmen, warehousemen, checkers ... and such other employees as may be presently or hereafter represented by the Union"). It also notes the much

---

**1.** Mr. Gerber testified that he had been an owner/operator with one truck since 1975. *See* Transcript at 43.

more limited description contained in the Participation Agreement ("DRIVERS represented by the Union"). The latter description was specifically intended to describe the Fat's Three. And it literally does describe them since the union never purported to represent any other drivers. If the district court so finds on remand, the *en banc* rehearing may result in a nullity. In any event, this discrepancy in description, although patent on the face of the documents, was never noted or questioned by the Funds, whose reliance on documents we are told is so crucial.

I take no issue with the broad purposes of ERISA as described in the majority opinion nor in the need to achieve a match between the contributions to, and the liabilities of, pension and welfare funds. Judge Easterbrook's excellent opinion in *Robbins v. Lynch*, 836 F.2d 330 (7th Cir.1988), was cited and quoted at length in the original panel opinion as an authoritative statement of general principles. But all rules must admit of equitable exception and modification in appropriate cases lest the tyranny of theory over reality bring about obnoxious results. Whatever asymmetries there may be in the funding of pension and welfare plans, it was likely that under the *panel* opinion, where Gerber had to make contributions plus liquidated damages through March 1985, the Plans were more than fully funded with respect to their liabilities for the Fat's Three. To require contributions for all the other employees, who have no corresponding claim for any benefits, is to present the Funds with a fat windfall. Gerber bought health insurance for his other employees from another source which presumably has already covered their health needs. And these other employees can hardly claim pensions they knew neither Gerber nor the union intended to provide them.[2]

Of course, in 99% of the cases it is necessary to enforce the written pension or welfare contribution requirements in order to avoid backsliding by employers—possibly abetted by unions. But here is a case where a miniscule employer's effort to help three superannuated truckdrivers has brought down on his head the full fury of a rule that knows no exceptions. A Gerber with his handful of trucks is no match for adversaries with platoons of accountants, actuaries and lawyers out to maximize his liabilities (in a good cause, no doubt). Yet, it seems to me that the Gerbers of the world (as the majority refers to them), starting to build a business beginning with their own single truck, deserve some consideration in preserving a common-sense balance.

I respectfully dissent.

KANNE, Circuit Judge, concurring in part and dissenting in part:

I am of the view that Judge Cudahy had it right in his opinion writing for the original panel, 854 F.2d 1074 (7th Cir.1988). I therefore concur with the majority *en banc* opinion insofar as it assesses liability against Gerber for the "Fat's Three" and dissent as to the broader liability which may be imposed for additional Gerber employees without the opportunity for an equitable exception.

---

**2.** In any event, there was no time in the short span covered in this case for any pension to vest.