Ken MacKILLOP; Kathy Morris; Ken Gabriel; Carl Wojciechowski; Harold Carlson, as Trustees for the Oregon Federation of Butchers Pension Trust; et al., Plaintiffs–Appellees,

v.

LOWE'S MARKET, INC., d/b/a St. Helens Shop N' Kart, Defendant–Appellant.

Ken MacKILLOP; Kathy Morris; Darrel Coffey; Carl Wojciechowski; Arthur Dulemba; Robert Hewett, as Trustees for the Oregon Federation of Butchers Pension Trust, Plaintiffs–Appellees,

v.

LOWE'S MARKET, INC., an Oregon corporation, d/b/a St. Helens Shop N' Kart, Defendant–Appellant.

Nos. 93–35541, 94–35102.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 2, 1995.

Decided July 11, 1995.

Frank S. Wesson, Portland, OR, for defendant-appellant.

Davis S. Barlow, Donaldson, Kiel & McKenzie, Seattle, WA, Stephen H. Buckley, Carney, Buckley, Kasameyer & Hays, Portland, OR, for plaintiffs-appellees.

Before: BROWNING, REAVLEY,* and NORRIS, Circuit Judges.

REAVLEY, Circuit Judge:

Lowe's Markets, Inc. (Lowe's) appeals a summary judgment in which the district court held it liable for pension and health care contributions to certain multiemployer benefit plans. We affirm.

## BACKGROUND

Lowe's operates an Oregon grocery store. Union representatives for the United Food and Commercial Workers Local 555 began picketing the store in 1991. This had a negative effect on business, and Lowe's eventually signed two collective bargaining agreements (CBAs) in August of 1991. One CBA, a retail meatcutter agreement, required Lowe's to make contributions on behalf of its employees to the Oregon Federation of Butchers Pension Trust. The second CBA, a grocery, produce and deli agreement, required Lowe's to make contributions to the Oregon Retail Employees Pension Trust Fund. Both agreements also required Lowe's to make contributions to a multiemployer health plan, the Portland Area UFCW Local 555–Employers' Health Trust. These

three fringe benefit plans (the Plans), are multiemployer benefit plans covered by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461.

In November of 1991, a Lowe's employee brought an unfair labor practices complaint before the National Labor Relations Board (NLRB). The complaint was against the union and Lowe's. Some of the employees had never wanted to join the union and claimed that they had been coerced by Lowe's and the union into approving union representation. They did not like having to pay dues and claimed that the union had told them they would not have jobs unless they paid dues and joined the union. After the complaint was filed, Lowe's stopped making payments to the Plans. It obtained its own health insurance to provide its employees with health benefits.

In February of 1993 an NLRB administrative law judge (ALJ) concluded that the CBAs were invalid because the union was selected as the exclusive representative of the employees at a time when it did not represent an uncoerced majority of the employees, in violation of various provisions of section 8 of the National Labor Relations Act (NLRA), 29 U.S.C. § 158. The ALJ recognized that "a union must represent an uncoerced majority in the appropriate unit and when the employer renders unlawful assistance in establishing the union's majority, recognition and acceptance thereof violates [the NLRA]." The ALJ concluded that Lowe's had improperly coerced the employees to join the union, and ordered Lowe's and the union "to cease and desist from giving effect to, or in any manner enforcing the [CBAs]." However, the order stated that "nothing shall require Respondent Lowe's to vary or alter any substantive feature or term of its relations with the unit employees which have been established by performance under the agreements, or prejudice any rights the employees may have acquired under the agreements." The order further required the posting of a notice to employees with similar language.

* Honorable Thomas M. Reavley, Senior United States Circuit Judge for the United States Court of Appeals, Fifth Circuit, sitting by designation.

In August of 1993 the NLRB affirmed the ALJ's decision on administrative appeal, noting in a footnote that "[f]or purposes of the [National Labor Relations] Act, we view the collective-bargaining agreements as never having had legal effect." Lowe's places great emphasis on this language, as discussed below.

Beginning in June of 1992, the trustees of the Plans sued Lowe's for unpaid employer contributions to the Plans. The district court denied a motion to stay pending the NLRB proceeding, and eventually granted the trustees' motion for summary judgment, entering money judgments for the amount of unpaid employer contributions to the Plans up to the date of the ALJ's ruling, together with interest and attorney's fees.

## DISCUSSION

### A. Effect of the NLRB's Invalidation of the CBAs

Lowe's argues that it has no obligation to the Plans by virtue of invalid collective bargaining agreements. The trustees argue that under ERISA Lowe's obligations remain even if the CBAs are invalid for not meeting the uncoerced majority requirement of the labor laws. The district court has awarded to the Plans those contributions due from Lowe's up to the date of the ALJ's ruling on February 24, 1993. We do not have before us any question of contributions due thereafter.

█ The key statute here is ERISA section 515, 29 U.S.C. § 1145, which was added to ERISA in 1980 and states:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

Several circuits including our own have analyzed this provision and its legislative history. They have concluded that in circumstances such as those presented here, section 515 mandates that employers are responsible for ERISA plan contributions regardless of defenses challenging the validity of the underlying CBA.

In *Southwest Administrators, Inc. v. Rozay's Transfer,* 791 F.2d 769 (9th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 999 (1987), we explained:

For reasons of public policy, traditional contract law does not apply with full force in actions brought under [ERISA] to collect delinquent trust fund contributions. In recognition of the fact that millions of workers depend upon employee benefit trust funds for their retirement security, Congress and the courts have acted to simplify trust fund collection actions by restricting the availability of contract defenses, which make collection actions unnecessarily cumbersome and costly.

*Id.* at 773 (citation omitted). We held that the defense of fraudulent inducement was not available in ERISA trust fund collection actions against employers. We drew a distinction between defenses which make an agreement voidable and those that render it void *ab initio,* and held that only the latter defenses, such as fraud in the execution, are available in such actions. *Id.* at 773–775.

In *Benson v. Brower's Moving & Storage, Inc.,* 907 F.2d 310 (2d Cir.1990), *cert. denied,* 498 U.S. 982, 111 S.Ct. 511, 112 L.Ed.2d 524 (1990), the Second Circuit affirmed a summary judgment in favor of the trustees of multiemployer pension plans suing an employer for unpaid contributions. The employer argued that it had no liability to the plans because no valid CBA existed. Specifically, the employer raised the defenses of lack of majority representation and abandonment of the CBA. The court rejected these defenses, concluding that the purpose of section 515 was "to insulate benefit plans from exactly these defenses." *Id.* at 313. The court reasoned that this section of ERISA severely limits defenses the employer might raise to the underlying CBA when benefit plans sue to recover employer contributions. It relied on congressional intent that "benefit plans must be able to rely on the contribution promises of employers because plans must pay out to beneficiaries whether or not employers live up to their obligations. For this

reason, Congress placed employee benefit plans in a position superior to the original promisee, analogous to a holder in due course." *Id.* at 314 (citation omitted). The court noted that the only valid defenses by an employer it could find were in cases where (1) the pension contributions themselves are illegal, or (2) the CBA is void rather than voidable. The example given of the latter exception is fraud in the execution, as where the employer was not even aware it was signing a CBA. *Id.* The court further found "unmistakably clear legislative intent" that one purpose of section 515 was to abolish the employer defense of lack of majority status. *Id.* at 316. It cited legislative history that section 515 was specifically aimed at overruling two "pre-hire agreement" cases. *Id.* In these cases,[1] an employer had signed a pre-hire agreement promising to abide by the terms of a CBA as soon as he hired his employees. The employers in these cases later escaped liability to benefit plans by arguing that the pre-hire agreements were invalid because the unions had failed to attain majority status.

The Eighth Circuit reached the same result in *Berry v. Garza,* 919 F.2d 87 (8th Cir.1990). It held that because the employer "knowingly entered into a facially valid collective bargaining agreement with the Union, he is now estopped from raising the defense of lack of majority status to avoid his obligation to the [ERISA] Fund." *Id.* at 90.

The Third Circuit followed a similar approach in *Agathos v. Starlite Motel,* 977 F.2d 1500 (3d Cir.1992). Plan trustees sued an employer for unpaid contributions. The employer argued that "the collective bargaining agreement was invalid because it was induced by a threat to picket and because the Union did not represent a majority of [employer's] employees at the time the agreement was executed." *Id.* at 1504. The court held that section 515 barred this defense, and that "the defense of lack of majority support for the union would not have been available to [employer] even prior to the enactment of section 515." *Id.* at 1506.

Further support for the Plans' position is found in *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Serv., Inc.,* 870 F.2d 1148 (7th Cir. 1989) (en banc). That case did not involve the defense of lack of majority status, but in discussing the legislative history of section 515, it noted the congressional intent to overrule the pre-hire agreement cases discussed above. It found that "nothing in ERISA makes the obligation to contribute depend on the existence of a valid collective bargaining agreement; the repudiation of cases such as *McDowell* and *Overhead Door* shows the opposite." *Id.* at 1153. Hence, the court concluded that if the employer simply points to a defect in the formation of the CBA "such as ... lack of majority support for the union ... it must still keep its promise to the pension plans." *Id.*

We find compelling the reasoning of these cases, and therefore conclude that an employer's assertion that the CBA is invalid due to lack of majority status is not a defense in an action brought by an ERISA plan or its trustees to collect employer contributions. Indeed, we conclude that Congress intended to abolish this very defense with the passage of section 515.

Lowe's points to language in a footnote of the NLRB decision affirming the ALJ, which states that "[f]or purposes of the Act, we view the collective-bargaining agreements as never having had legal effect." Lowe's argues that this language proves that the CBAs were void *ab initio.* We are unpersuaded by this argument. First, the NLRB's reference to the "Act" is a reference to the NLRA. Lowe's liability here, however, flows from section 515 of ERISA, where the legislative purpose was to preclude CBA defenses from being used as a defense to the ERISA obligation of employers to fund multiemployer benefit plans. Second, while cases such as *Benson* and *Agathos* recognize that section 515 does not mandate employer contributions where the CBA is void *ab ini-*

---

1. *Washington Area Carpenters' Welfare Fund v. Overhead Door Co.,* 488 F.Supp. 816 (D.D.C. 1980); *Western Washington Laborers–Employers* *Health & Security Trust Fund v. McDowell,* 103 L.R.R.M. 2219, 1979 WL 33480 (W.D.Wash. 1979).

*tio,*[2] they nevertheless hold that the very defense raised here, lack of majority status, is not a valid defense to the employer's obligation to an ERISA plan. Third, the NLRB decision makes clear, in the notice to employees it required Lowe's to post after the decision, that "[n]othing, however, shall require us to vary or abandon any wage, hour, seniority, or other substantive feature of our relations with you which has been established in the performance of these agreements with the Union, nor will you be prejudiced in the assertion of any rights you may have under the agreements."

Three recent Ninth Circuit opinions bear on our analysis. In *Sheet Metal Workers' Int'l Ass'n v. West Coast Sheet Metal Co.,* 954 F.2d 1506 (9th Cir.1992), we held that an employer's obligations to make contributions to employee benefit plans as provided in a CBA ceased when the employees of the union voted to decertify the union. In effect we granted relief prospectively from the date of the event which terminated the CBA. In contrast, the employer here, through unilateral conduct, simply ceased making contributions to the Plans upon the filing of the NLRB action. The Plan trustees only sought, and the district court only allowed in its judgments, contributions up to the date of the ALJ's ruling that the CBAs were unenforceable.

In *Carpenters Health & Welfare Trust Fund v. Bla–Delco Constr., Inc.,* 8 F.3d 1365 (9th Cir.1993), ERISA benefit plans also sought unpaid contributions from an employer. The employer had entered into agreements with a union agreeing to be bound by a master collective bargaining agreement, and providing that either party could withdraw from the agreement upon giving notice. The employer and the union disputed whether proper notice had been given. We held that the CBA was not void but merely voidable upon the giving of proper notice, and that this defense did not apply in the action by the ERISA plans to recover benefits from the employer. We concluded that the employer "could have pursued its dispute with the Union under the grievance and arbitration procedures of the CBA.... [T]he Trust

Funds were not required to follow those procedures. It would contravene the policy to simplify and expedite trust fund collection actions to require the Trust Funds' in this case to litigate the termination dispute between [the employer] and the Union." *Id.* at 1369.

Most recently, in *Laborers Health and Welfare Trust Fund v. Westlake Dev. Co.,* 53 F.3d 979 (9th Cir.1995), ERISA benefit plans again sought recovery of contributions from an employer. The employer had signed a pre-hire collective bargaining agreement under section 8(f) of the NLRA, 29 U.S.C. § 158(f). Section 8(f) covers certain pre-hire agreements in the building and construction industry. The employer's defense was that the agreement was unenforceable based on the " 'one-employee unit rule,' which provides that employers need not participate in collective bargaining if they have only a single employee who falls within the collective bargaining unit." *Id.* 53 F.3d at 981. The employer had purported to unilaterally terminate the agreement based on this rule. We recognized that, as a matter of labor law, pre-hire collective bargaining agreements ordinarily cannot be terminated by the employer's unilateral repudiation of the agreement, but that the " 'unique circumstances of a single-employee bargaining unit in the construction industry' " made it appropriate to treat repudiation under the one-employee unit rule as " 'equivalent to a repudiation resulting from decertification of the bargaining representative.' " *Id.* at 982 (quoting *Operating Eng'rs Pension Trust v. Beck Eng'g & Surveying Co.,* 746 F.2d 557, 565 (9th Cir.1984) and district court). We held that the exception to the general rule allowing unilateral repudiation of a CBA based on the one-employee unit situation meant that the repudiation was lawful and rendered the CBA void rather that voidable. We distinguished *Bla–Delco* on this basis. *Id.* at 984.

■ We believe that these cases can be reconciled with each other and with our decision today. Although *Rozay's Transfer* recognized that section 515 limited the availability of contract defenses in collection actions

---

**2.** *See Benson,* 907 F.2d at 314; *Agathos,* 977 F.2d     at 1505.

brought on behalf of ERISA benefit plans, it also recognized that "[f]or an employer to be obligated to make employee benefit contributions to a trust fund, there must exist a binding collective bargaining agreement." 791 F.2d at 773. The issue we face is when a binding collective bargaining agreement ceases to exist. *Sheet Metal Workers'* holds that the voluntary decertification of a union by its employees ends the collective bargaining agreement, and employer obligations to the ERISA plans cease upon that event. 954 F.2d at 1509. *Westlake* holds that, in the unique circumstance of a section 8(f) pre-hire collective bargaining agreement, an employer's unilateral repudiation of such agreement under the one-employee unit rule renders the agreement void, and the obligation to the ERISA benefit plan also ceases upon repudiation. 53 F.3d at 984. As a general proposition, however, unilateral action of an employer will not render a CBA void and unenforceable, nor will the mere assertion by the employer that the union lacks majority status. *Sheet Metal Workers'*, for example, distinguished an "employer's after-the-fact attempt to extricate itself through unilateral action from trust fund obligations that it knowingly accepted," and noted that "[a]t the time the 1986 [CBA] was imposed, [the employer] had no way of being certain that the union would lose its majority status." 954 F.2d at 1510. Where there are grievance and arbitration procedures under the CBA, as in *Bla–Delco*, the obligation to make contributions to the ERISA plans continues until those procedures are followed and the CBA is ruled to be terminated by the appropriate authority. *See Bla–Delco*, 8 F.3d at 1369. Similarly, in our case, where an NLRB action had been initiated to determine whether the CBA was invalid for lack of majority status, the employer's obligations to the Plans continued until the NLRB ruled that the CBA had no force and effect.

### B.  *Denial of Motion to Stay*

Lowe's argues that the district court erred in denying its motion to stay the federal suit pending resolution of the NLRB proceeding. Assuming that this argument is not moot, we review the denial of a motion to stay under the abuse of discretion standard. *Sheet Met-*

*al Workers Int'l Ass'n v. Jason Mfg., Inc.*, 900 F.2d 1392, 1400–01 (9th Cir.1990). Based on the discussion above, Lowe's obligation to make Plan contributions remained regardless of the validity of the CBAs, up to the date of the NLRB's decision regarding such validity. Further, the NLRB could not have granted the relief requested in this suit, as such relief was not requested before the NLRB and the Plans were not even parties to the NLRB proceeding. In addition, the outcome in our case ultimately turns on ERISA, a statute that the NLRB has no unique expertise in interpreting so as to merit a stay by a federal district court. In these circumstances we find no abuse of discretion.

### C.  *Alternative Health Plan*

■ Lowe's makes one argument concerning the health Plan only. It points out that it began providing alternative health insurance coverage to its employees in January of 1992, after it ceased making contributions to the union's multiemployer health Plan. Lowe's argues that it would be unfair to require it to make retroactive contributions to the union multiemployer health plan after that date. The effect of the judgments below were to require contributions from the date that Lowe's stopped making payments to the health Plan to the date of the ALJ's decision in February of 1993.

We believe that the essential purpose of section 515 would be far too easily circumvented if an employer could unilaterally stop making contributions to an employee benefit plan as required by the CBA and the plan documents, and defend such action on grounds that it provided some form of substitute coverage for its own employees. For example, *Benson* teaches that "benefit plans must be able to rely on the contribution promises of employers because plans must pay out to beneficiaries whether or not employers live up to their obligations." 907 F.2d at 314. And *Gerber Truck* explains that "[p]lans rely on documents to determine the income they can expect to receive. . . . Once they promise a level of benefits to employees, they must pay even if the contributions they expected to receive do not materialize—perhaps because employers go broke, perhaps

because they are deadbeats, perhaps because they have a defense to the formation of the contract. If some employers do not pay, others must make up the difference in higher contributions, or the workers will receive less than was promised." 870 F.2d at 1151.

The situation might be different if the health Plan was derelict in its own obligations to provide benefits as required by the Plan documents, or otherwise failed to comply with ERISA. For example, in *Agathos*, the court found that the record suggested that "[the employer's] unreported employees failed to collect benefits not because they lacked meritorious claims or because they were dilatory in submitting their claims, but because the Funds persistently violated their 'watchdog' duties under ERISA to identify the employees and inform them of their participation in the plans. This circumstance militates against unconditionally requiring [the employer] to make contributions to the Funds." 977 F.2d at 1507. Lowe's, however, offered no summary judgment evidence that the health Plan failed in its own obligations to Lowe's employees.

AFFIRMED.