Thomas J. MORIARTY,
Plaintiff–Appellee,

v.

James F. SVEC, individually, doing business as Svec and Sons Funeral Home and doing business as West Suburban Livery, Defendant–Appellant.

No. 98–1849.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 25, 1998.

Decided Dec. 14, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 14, 1999.

was an appropriate consideration, we need not reach that issue.

David S. Allen (argued), Marisel A. Hernandez, Jacobs, Burns, Sugarman, Orlove & Stanton, Chicago, IL, for Plaintiff–Appellee.

Douglas A. Darch (argued), Joshua M. Henderson, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendant–Appellant.

Before FLAUM, MANION, and EVANS, Circuit Judges.

FLAUM, Circuit Judge.

Under the terms of a series of collective bargaining agreements ("CBAs") with Teamsters Local No. 727 ("Union"), James Svec, the owner and operator of the Svec & Son's Funeral Home ("Funeral Home") and the West Suburban Livery Service ("WSL"), promised to make contributions to multi-employer pension and welfare funds on behalf of his employees. However, James made no contributions on his own behalf, nor on behalf of WSL's employees, claiming that neither were covered by the CBAs. The Trustee of the pension and welfare funds sued to compel payment and the district court granted its motion for summary judgment. James appealed that decision, and we now vacate and remand for further consideration.

## Background

James Svec and his sister Sharon own the Funeral Home and WSL together.[1] Since the death of their father, Elmer Svec, James has operated both businesses as sole proprietorships. Until 1995, the Funeral Home belonged to the Funeral Directors Services Association ("FDSA"), an employer organization of approximately 250 licensed funeral businesses providing funeral, livery and fu-

---

1. Although originally named as a defendant, the Trustee has since voluntarily dismissed Sharon Svec.

neral transportation services. The FDSA entered into a series of CBAs with the Union requiring each of its members to contribute to the Union's Pension Trust and Health & Welfare Fund ("Funds") on behalf of their employees in various work classifications.[2]

Elmer Svec died in June 1987. He had been the sole proprietor of the Funeral Home and a part owner of WSL with James for many years. At his death, Elmer's interest in both enterprises passed to his wife Anne. She later divided her interest in the businesses equally between James and Sharon. On February 16, 1988, Anne disclaimed all her rights, title, and interest in the real estate connected with the Funeral Home, and on April 15, 1993 James and Sharon signed documents indicating the receipt of their shares in the businesses. The legal consequences of Anne's disclaimer and the documents signed by James and Sharon are disputed by the parties.

During the period the Funeral Home belonged to the FDSA, Elmer, and later James, never made contributions to the Funds for work performed by James himself, nor did they contribute on behalf of any WSL employees. In 1997, the Trustee of the Funds, Thomas Moriarty, sued under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 (1997), and Sections 502(a)(3) and 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(3) and 1145 (1997), to collect unpaid contributions on behalf of James and the WSL employees.

In the district court, James argued that he had been the "principal owner" of the Funeral Home since his father's death in 1987 and was therefore not an "employee" as defined by the CBAs. He thus claimed not to owe any contributions on his own behalf since 1987. James also argued that when the Funeral Home changed hands Illinois' common law of successor liability cut off any obligation to pay the contributions that his father failed to make. Finally, James maintained that WSL, which had never been a member of the FDSA, was not bound by the CBAs and, therefore, he owed nothing to the

Funds on behalf of its employees. The Trustee responded that even if the CBAs excluded "principal owners," James did not become one until 1993, on the day he signed documents acknowledging receipt of his shares in the business. James therefore owed contributions for himself from 1987 to 1993. The Trustee also argued that under ERISA, federal successor liability preempts state law and makes James liable for the contributions his father had failed to pay. Finally, because the Funeral Home and the WSL are in practice a "single employer", the latter is subject to the CBAs to the same extent as the former, so James owed contributions to the Funds on behalf of all WSL employees.

The court agreed with these arguments and found for the Trustee. In addition to granting its motion for summary judgment requiring the payment of back contributions, the court also awarded the Trustee's attorney's fees and costs.

Ten days before the court issued its summary judgment order, the National Labor Relations Board ("NLRB" or "Board") decided a dispute between WSL and the Union. *James Svec and Sharon Svec d/b/a West Suburban Livery and Auto Livery Chauffeurs, Embalmers, Funeral Directors, et al., I.B.T. Local 727, AFL–CIO, NLRB* Case No. 13–RM1657 (Feb. 9, 1998) (unpublished Decision and Order). The issue before the Board was whether the Union represented WSL's employees for collective bargaining purposes. While it found that the Funeral Home and WSL constituted a "single employer", the Board concluded that the Union did not represent WSL's employees.

Although James failed to inform the court of the Board's proceedings or decision, he filed a motion to re-consider after the summary judgment order claiming the NLRB's decision stripped the court of jurisdiction to declare WSL bound by the CBAs. The court rejected James's motion, explaining that he had waived this argument by not presenting it prior to summary judgment.

---

**2.** The Funeral Home withdrew its membership in the FDSA in 1995, and the parties agree that for the purposes of this case, all liability pursuant to the CBAs ceased at that time.

On appeal, James raises three objections to the district court's order. First, he argues that the court's approach to successor liability is impermissible in light of the Supreme Court's recent decision in *Atherton v. FDIC*, 519 U.S. 213, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997) because it amounts to the creation of unnecessary federal common law. Next, the court erred in holding as a matter of law that the term "employee" in the CBAs unambiguously described James at all relevant times, rendering him liable for contributions on his own behalf. Third, once the NLRB rendered its decision, the court should not have decided whether WSL was a party to the CBAs. Because the Board held that WSL's employees were not represented by the Union, they could not be bound by the CBAs and the court had no jurisdiction to hold otherwise.[3] While we agree with the findings of the district court regarding successor liability and liability for WSL employees, because the question of James's liability for contributions on his own behalf was not fully addressed below, we remand for reconsideration.

## ANALYSIS

### Successor Liability

■ James argued in the district court that, according to Illinois' common law of successor liability, he was not liable for any contributions his father Elmer failed to pay before his death on June 29, 1987. If state law applied, James would be correct. Consistent with its interest in facilitating the market for productive assets, Illinois common law states that a successor entity does not assume the liability of its predecessor.[4] *Vernon v. Schuster*, 179 Ill.2d 338, 228 Ill. Dec. 195, 688 N.E.2d 1172, 1175 (Ill.1997) (son's inheritance of father's sole proprietorship cuts off liability). Under Illinois law,

because the original Funeral Home ended with the death of his father, James should not have to pay any contributions which accrued prior to that date.

■ The district court did not dispute this interpretation of state law. Instead, it held that Illinois' successor liability rule had been pre-empted in this situation by federal common law. *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323 (7th Cir.1990). In *Artistic Furniture*, we stated that in order to further congressional objectives, successor entities can be liable for multiemployer pension contributions if (1) there is sufficient continuity between the two companies and (2) the successor company had notice of the predecessor's liability. *Id.* at 1329. Because the only change in the Funeral Home since Elmer's death was James's ownership, the district court easily found sufficient continuity between the two entities. The court also held as a matter of law that James had notice of the contribution liability prior to taking control. *See EEOC v. Vucitech*, 842 F.2d 936, 945 (7th Cir.1988) ("[T]here is no question that the successor knows of any collective bargaining agreements that his predecessor has signed ...").

■ On appeal James claims the district court's approach is impermissible in light of the Supreme Court's decision in *Atherton v. FDIC*, 519 U.S. 213, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997). *Atherton* requires a showing of significant conflict between a specific federal interest and the use of state common law before a court can displace that common law with a federal rule. *Id.* at ——, 117 S.Ct. at 673. The mere existence of federal regulation in an area does not necessarily create sufficient conflict. *Id.* at ——, 117 S.Ct. at 670. According to James,

---

3. James also objects to certain items included in the court's award of costs and attorney's fees. While we realize that this award may have to be adjusted on remand to reflect any additional proceedings, we see no error in any of the cost and fee calculations the court has already ordered.

4. To prevent fraud or fundamental unfairness to creditors, Illinois's general rule against successor liability contains four exceptions: "(1) Where

there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligation." *Vernon*, 179 Ill.2d 338, 228 Ill.Dec. 195, 688 N.E.2d at 1175. No exception, however, is relevant here.

no conflict exists here because the provision the Trustee is attempting to enforce, Section 515 of ERISA, is meant to supplement, not displace state common law: "[Section 515] only creates a federal ERISA obligation for employers who are obligated to make contributions even absent the statute—in other words, those who are obligated under state law." *Sullivan v. Cox*, 78 F.3d 322, 325 (7th Cir.1996). Also, courts follow common law rules in other areas of Section 515, implying the absence of any significant conflict. *See Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1193–94 (7th Cir.1989) (applying state corporate veil-piercing law to determine Section 515 liability of corporate officers). Essentially, James maintains that *Artistic Furniture* amounts to the creation of impermissible common law and he asks us to overrule it. *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ("There is no federal general common law.").[5]

■ The Trustee responds that James has waived this argument by failing to raise it below.[6] *See Koffski v. Village of North Barrington*, 988 F.2d 41, 44 n. 7 (7th Cir. 1993). This is incorrect for two reasons: First, James has properly preserved the argument by raising the common law successor liability issue. Unlike the cases cited by the Trustee, where parties attempted to raise new legal or factual arguments for the first time on appeal, James's current claim is contained in what he argued in district court. Implicit in the claim that state common law governed this case was that no federal rule conflicted. Second, and more fundamentally, an appellant can always challenge the legal theory upon which the district court relied in its decision. As we have previously explained, "[i]t is folly ... to assert that an appeals court on review of a district court judgment cannot consider the merits of each and every theory the district judge relied upon in deciding the case." *United States v. City of Chicago*, 869 F.2d 1033, 1036 (7th Cir.1989). The district court's decision relied on a theory of federal preemption in holding James liable. *See Moriarty v. Svec*, 994 F.Supp. 963, 968 (N.D.Ill.1998). He is now free to argue on appeal that the court's theory was wrong.

■ However, James's argument on the merits is not convincing. We read nothing in *Atherton* as undermining *Artistic Furniture*. *Atherton* simply reminds federal courts that *Erie* is still the law and that we are not free to fashion federal rules around a statute without identifying a significant conflict created by the application of state common law. 519 U.S. at ——, 117 S.Ct. at 670. In *Atherton*, the Court rejected the FDIC's attempt to apply a pre-*Erie* federal common law standard of care for officers of federally chartered banks. The Court found that applying state common law did not significantly conflict with the federal interest in uniformity. Nor did federal incorporation of the banks at issue or the FDIC's rule-making power create a conflict with the application of state law. *Id.* at ——, 117 S.Ct. at 671–73.

■ *Atherton* does not preclude courts from applying appropriate federal rules in areas where Congress manifests a desire to avoid significant conflict. ERISA is one of those areas. The Supreme Court has recognized that Congress, in enacting ERISA, "in-

---

**5.** At oral argument, James's counsel argued for the first time that our decision in *Artistic Furniture* also impermissibly preempts state probate law. According to James, because the Trustee in this case did not pursue his claim against Elmer Svec's estate in any probate proceeding yet was still able to collect the unpaid contributions, state probate law is being displaced by a federal rule. This argument is unavailing. First it is almost certainly waived: "The well-established rule in this Circuit is that a plaintiff waives the right to argue an issue on appeal if she fails to raise the issue before a lower court." *Robyns v. Reliance Standard Life Insurance*, 130 F.3d 1231, 1238 (7th Cir.1997). Even if it were not waived, moreover, we question whether anything in *Artis-

tic Furniture* displaces state probate law. The district court found James's Funeral Home to be the successor of the Funeral Home run by Elmer. The liability James faces does not spring from Elmer Svec's estate but from the court's finding that the Funeral Home continued to be responsible for past contributions. The disposition of Elmer's estate, and therefore Illinois probate law, is irrelevant.

**6.** In the district court, James only argued that under the state common law rule of successor liability, he was not liable. He did not mention federal common law.

tended that a body of Federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (quoting 120 Cong. Rec. 29942 (1974) (remarks of Senator Javits)). This court has developed such federal common law in the interpretation of ERISA plans. *See Mathews v. Sears Pension Plan*, 144 F.3d 461, 465 (7th Cir.1998); *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997); *Swaback v. American Information Technologies Corp.*, 103 F.3d 535, 540 (7th Cir.1996). Our decision in *Artistic Furniture* is consistent with this approach and with *Atherton*.

In *Artistic Furniture*, we identified a significant federal interest that was threatened by the common law rule of successor liability. 920 F.2d at 1328. As we stated in describing Section 515: "The federalization of multiemployer plan contribution obligations evinces a strong congressional desire to minimize contribution losses and the resulting burden such losses impose on other plan participants." *Id.* We emphasized that the state law of successor liability, which cuts off the obligation to pay a predecessor's promised contributions, significantly conflicts with this federal interest and justifies a departure:

> Absent the imposition of [federal] successor liability, the hardships that Congress sought to stave off in enacting [Section 515] may indeed result in cases where a predecessor employer is unable to fulfill its contribution obligations. As old collective bargaining agreements are renegotiated, and new ones are formulated, present and future employers will have to increase their plan contributions in order to cover shortfalls created by the financial collapse of delinquent employers. In the face of this possible consequence, we believe that the congressional policies animating [Section 515] support the imposition of successor liability for unpaid multi-employer pension fund contributions ...

920 F.2d at 1329.

James reasons that because Section 515 is based on rights created by state law, and

because this court has applied state law to other questions arising under Section 515, we must in every circumstance apply state common law. This all-or nothing approach is not supported by any case James cites. *See Sullivan*, 78 F.3d at 324–25; *Levit*, 874 F.2d at 1193. Indeed, these cases only stand for the proposition that, absent some conflict, courts should apply state common law to questions arising under Section 515. But a conflict is exactly what *Artistic Furniture* addresses.

*Artistic Furniture* remains this circuit's approach to federal rule-making under ERISA and nothing the Supreme Court has said undermines it. Thus federal instead of state successor law applies to this case. Because James does not challenge the district court's finding that both the continuity of ownership and notice requirements have been met, its decision should stand, and James should be liable for any contributions under the CBAs his father was obligated to pay.

### Contributions on Behalf of James Svec

James next argues that he owes no contributions on his own behalf after the date he became the principal owner of the Funeral Home. Both parties seem to agree that contributions are not required for principal owners because they are excluded from their understanding of the term "employee" in the CBAs. Anne Svec, James's mother, renounced her interest in the business in 1988. This, James argues, made him the principal owner as of June 1987, the date of Elmer's death, according to Illinois's relation-back doctrine. *See In re Atchison*, 925 F.2d 209, 211 (7th Cir.1991) (discussing Illinois's relation-back doctrine for disclaimed testamentary gifts); *Tompkins State Bank v. Niles*, 127 Ill.2d 209, 130 Ill.Dec. 207, 537 N.E.2d 274, 279 (Ill.1989). According to James, the formalization of the agreement in 1993 was simply meant to clarify any uncertainty regarding his and Sharon's interest in the business. Thus he was the principal owner since his father's death and does not owe any contributions on his own behalf past 1987. The Trustee responds that Anne's 1988 disclaimer only covered the real property connected to

the Funeral Home and not her interest in the business itself. Also, the Funeral Home treated James as an employee in its tax returns and other paperwork between 1988 and 1993. Therefore James was not the principal owner until 1993, and he was obligated to contribute on his own behalf until that date. While James denies this interpretation, he argues that at the very least it raises an issue of material fact sufficient to survive summary judgment.

The district court avoided this dispute by holding that the CBAs are unambiguous and do not contain any principal owner exception. Therefore, it did not determine the exact date on which James became the principal owner. The court read the term "employee" in the CBAs as susceptible to only one reasonable interpretation, and because James worked for the Funeral Home at all relevant times, he was always an employee. That both parties agree no contributions are owed for principal owners is irrelevant if no such exclusion is evident on the face of any of the CBAs. Any exceptions, the court reasoned, amounts to an oral side agreement that is not enforceable if it conflicts with the unambiguous terms of the CBAs. *Central States v. Gerber Truck Service*, 870 F.2d 1148, 1149 (7th Cir.1989) (en banc) (plan trustee entitled to enforce writing "without regard to understandings or defenses applicable to the original parties.") Because the court found the term "employee" unambiguously included James, he owed contributions on his own behalf for as long as he worked at the Funeral Home.

■■■■■ We review de novo the district court's interpretation of pension plan terms and will affirm the grant of summary judgment only if there is no genuine issue of material fact and the Trustee is entitled to judgement as a matter of law. *Krawczyk v. Harnischfeger Corp.*, 41 F.3d 276, 278 (7th Cir.1994). As we have stated, "Summary judgment is particularly appropriate in cases involving interpretation of written contracts." *ICEBU v. Hyster–Yale Materials Handling, Inc.*, 83 F.3d 930, 932–33 (7th Cir.1996) *citing Ryan v. Chromalloy American Corp.*, 877 F.2d 598, 602 (7th Cir.1989). If the contract is susceptible to only one reasonable inter-

pretation, it is unambiguous and the court should determine its meaning as a matter of law. *ICEBU*, 83 F.3d at 933. The ambiguity of otherwise clear terms can be established by extrinsic evidence if there is "contractual language on which to hang the label of ambiguous or some yawning void ... that cries out for an implied term." *Bidlcak v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir.1993). We must reverse and remand if we disagree with the lower court's finding that no ambiguity exists in a contract term and conclude that further proceedings are necessary to establish its meaning. *See Central States v. Kroger Co.*, 73 F.3d 727, 733 (7th Cir.1996).

We begin with the statutory basis for the Trustee's claim. Section 515 of ERISA provides that:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collective bargaining agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. In this case, contributions must be made in accordance with the terms of the CBAs. Section IV of each CBA requires that "each employer member shall contribute [to the Funds] ... on account of each salaried employee covered by this agreement who is in the employ of such employer member ..." The relevant CBAs define "employee" as "any member of the Union who is in the employ of an employer member who is serving as a funeral director or embalmer trainee." The district court found that this definition unambiguously covered James because he was a Union member who did funeral directing for the Funeral Home. Because it found no ambiguity in the term "employee", the district court declined to examine any extrinsic evidence of the parties' understanding of the term.

■■■■■ We respectfully decline to follow the district court's approach because we see ambiguity in the use of the term "employee" in the CBAs. First, we look to the understanding of the term in its ordinary and popular sense. *See Phillips v. Lincoln Nat'l*

*Life Ins. Co.*, 978 F.2d 302, 308 (7th Cir. 1992). We have previously noted that the ordinary definition of the term "employee" is "one employed by another ..." *ICEBU*, 83 F.3d at 933 *quoting* Webster's Third New International Dictionary 743 (1986). This understanding would seem to exclude those who work for themselves. Can a single person be both an employee and "another" at the same time? As James points out, the ordinary sense of the term implies at least two people—the employer and the employee.[7]

Under ERISA, a pension plan participant cannot be both an employer and an employee at the same time: "The majority of courts to address the issue ... have concluded that such 'dual status' individuals are barred from participation." *Kwatcher v. Massachusetts Service Employees Pension Fund*, 879 F.2d 957, 958 (1st Cir.1989); *Peckham v. Board of Trustees*, 653 F.2d 424, 427 (10th Cir.1981); *but see Dodd v. John Hancock Mutual Life Ins. Co.*, 688 F.Supp. 564, 571 (E.D.Cal.1988) (contra); *see also Grantham v. Beatrice Co.*, 776 F.Supp. 391, 393 (N.D.Ill.1991) (corporate directors are not "employees" under ERISA plan). Moreover, the regulations promulgated by the Secretary of Labor pursuant to ERISA exclude from the definition of employee any individual who wholly owns a trade or business, whether incorporated or unincorporated. *Giardono v. Jones*, 867 F.2d 409, 412 (7th Cir.1989) (a sole proprietor cannot participate in an ERISA pension plan) (construing 29 C.F.R. § 2510.3-3(c)(1)); *Matter of Baker*, 114 F.3d 636, 639 (7th Cir.1997) (same); *but see Madonia v. Blue Cross & Blue Shield of Virginia*, 11 F.3d 444, 449 (4th Cir.1993) (holding that 29 C.F.R. § 2510.3-3 does not modify the statutory definition of employee for all purposes). These cases at least indicate that in other areas of

ERISA, the term employee does not necessarily include those who work for themselves.

The definition used in the CBAs does not appear to change the general ERISA conception of employee. It only adds the requirement that a person for whom benefits are owed must belong to the union and perform funeral directing services for a member of the FDSA. This definition does not answer whether a self-employed person is employed "by another" or not. Both interpretations are reasonable in this context, so the term is necessarily ambiguous. We are therefore precluded from affirming the grant of summary judgment. *Kroger*, 73 F.3d at 733.

In the face of such ambiguity, a court should look at extrinsic evidence to determine what meaning the parties attached to the term. *See FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 620–21 (7th Cir.1989). Although both parties seem to agree that principal owners are not included in their understanding of the term "employee", the district court felt compelled to disregard this evidence. The court relied on our decision in *Gerber* for the proposition that Section 515 of ERISA "prevents a court from giving force to oral understandings between the union and employer that contradict the writing." 870 F.2d at 1154. In *Gerber*, an employer and a union agreed that only a few of the employer's drivers would be covered by a collective bargaining agreement requiring contributions to a pension fund which, on its face, covered all employees. There was no ambiguity in the terms of the agreement in *Gerber*, only a second oral agreement which limited coverage to the detriment of the pension plan. *Id.*[8] In the present case, there is nothing inconsistent about the parties' understanding of the term "employee" in the CBAs

7. The district court did not attempt to draw any distinction between James individually and the Funeral Home as an entity. This was appropriate. The Trustee is seeking contributions from James Svec himself and because the Funeral Home is operated as a sole proprietorship, it is not clear that it has any independent legal significance in this case. *See Matter of Baker*, 114 F.3d 636, 639 (7th Cir.1997) (noting that in sole proprietorship, person and business are identical, and the business is not entitled to special entity status of corporation).

8. In *Gerber*, as in this case, because the pension plan was a "defined benefits" plan, it required the pension fund to pay a certain level of benefits regardless of the amount of contributions collected for employers. The fund is harmed whenever an employer is allowed to avoid payment, or to secure benefits for workers nearing retirement age while avoiding paying contributions on behalf of younger employees. 870 F.2d at 1155 n. 3.

and the term itself. As noted above, "employee" does not necessarily include the self-employed. Even the Trustee admits that principal owners are not employees; that is why it seeks contributions only through April 1993, the date upon which they claim James became a principal owner. Otherwise the Trustee may have had a fiduciary duty to seek contributions on behalf of James through 1995, the date the Funeral Home withdrew from the FDSA, ending its obligation to make any new contributions to the Funds. *See* 29 U.S.C. § 1104(a)(1)(A)(i). Therefore, unlike *Gerber*, this is not a case where the pension plan's expectations are being frustrated by secret side agreements negating previously negotiated CBAs. *See* 870 F.2d at 1155. The extrinsic evidence of the parties' understanding of the term "employee" is highly relevant, and in this case, the district court must consider it. That both parties agree on the term's interpretation does not automatically make that understanding an impermissible side deal.

Thus, because we do not consider the term "employee" to be unambiguous in this case, we must allow the district court to examine its meaning more fully. If the court finds that the term does not encompass principal owners, it must then determine when, based on the parties' evidence, James became one.

### Contributions for WSL Employees

The district court found that the Funeral Home and WSL were a single employer.[9] The single employer doctrine holds that when two entities are sufficiently integrated, they will be treated as a single entity for certain purposes. *Radio and Television Broadcast Technicians Local Union 1264 v. Broadcast Service*, 380 U.S. 255, 256, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965). The district court examined the following criteria in deciding that WSL and the Funeral Home comprised a single integrated enterprise: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership. *South Prairie Construction Co. v. Local No. 627, International Union of Operating Engineers, AFLCIO*, 425 U.S. 800, 802 n. 3, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976) (quoting 380 U.S. at 256, 85 S.Ct. 876). The district court found that the Funeral Home and WSL easily met this test and held that, as a single employer, the two businesses were both covered by the CBAs and each must make contributions to the Funds.[10] Thus, although WSL did not sign any CBA, but the Funeral Home had, James owed contributions on behalf of all WSL employees within the CBA's definition.

Just prior to the district court's award of summary judgment, the NLRB decided the same single employer issue in a dispute between WSL and the Union. The question before the NLRB was whether the Union represented WSL's drivers for collective bargaining purposes. When the Union demanded to bargain on behalf these drivers, WSL filed a petition with the Board claiming that the drivers were not and had never been represented by the Union. The Union claimed that WSL and the Funeral Home were a single employer and because they represented employees of the Funeral Home, they necessarily represented the drivers of WSL as well. *NLRB* Case No. 13–RM–1657 at 2 (Unpublished Decision and Order). Although the Board, like the district court, found that the Funeral Home and WSL were a single employer, it held that WSL's drivers were not part of the same bargaining unit as the Funeral Home and were therefore not represented by the Union. *Id.* at 5 ("[I]t does not necessarily follow from the single employer finding that the Union is the representative of [WSL's] drivers by virtue of its collective bargaining agreement with [the Funeral Home].").

---

9. The Trustee also claimed that WSL was the alter ego of the Funeral Home and that it displayed an independent intent to be bound by the terms of the CBA. Because we agree with the district court that the single employer finding disposes of the question of liability for contributions on behalf of WSL's employees, we need not address the Trustee's other theories.

10. Although James objects to the court's conclusion regarding coverage of the CBAs, he disputes neither the court's, nor the NLRB's, single employer finding.

James reads the Board's decision to mean that because the employees of WSL are not in the bargaining unit represented by the Union, they are not covered by the CBAs negotiated by the Union. Therefore, James argues, he owes no contributions to the Funds on behalf of any current or former WSL employees.

The NLRB proceedings were apparently unknown to the district court until after it had granted summary judgment. When James moved to reconsider in light of the Board's decision, the court denied the motion, explaining in its order that such a motion may not be used to argue matters which could have been heard during the pendency of the summary judgment proceeding. *Caisse Nationale De Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996). According to the court, because James knew about the Board's deliberation prior to the final judgment he could not now use it as the basis for reconsideration. *Id.* (only new evidence or "manifest errors of law" by the court justify reconsideration).

James now claims that the district court lacked subject matter jurisdiction to decide whether WSL employees were entitled to contributions under the CBAs. Arguing that this is a representational issue, within the exclusive province of the NLRB (*see United Ass'n of Journeymen & Apprentices, Local 342 v. Valley Eng'rs*, 975 F.2d 611, 613 (9th Cir.1992)), James claims that the district court had no power to decide who was covered by the CBA, and should instead have deferred to the Board's bargaining unit decision. *See South Prairie Construction Co.*, 425 U.S. at 803–06, 96 S.Ct. 1842. This jurisdictional argument, James insists, can be raised at any time. *Gorden v. Kreul*, 77 F.3d 152, 156 (7th Cir.1996). Alternatively, he maintains that the NLRB's determination meant that WSL could not, as a matter of law, be subject to the CBAs and therefore

the court's decision amounted to "a manifest error of law." 90 F.3d at 1270.

James's primary argument is jurisdictional. He claims that single employer status alone can make a non-signatory entity liable under a collective bargaining agreement only after there has been a separate finding that both entities form a single bargaining unit. *Stardyne, Inc. v. NLRB*, 41 F.3d 141, 144 (3rd Cir.1994) ("When two entities are found to be a single employer, one entity's collective bargaining agreement covers the other entity as well, provided that the two entities' employees constitute a single appropriate bargaining unit."). Not only is the bargaining unit determination necessary, argues James, it is also within the NLRB's exclusive jurisdiction. *See South Prairie*, 425 U.S. at 804, 96 S.Ct. 1842 (holding that federal court should not have made bargaining unit decision in multi-employer case); *Brotherhood of Teamsters, Local 70 v. California Consolidators, Inc.*, 693 F.2d 81, 83 (9th Cir.1982) (only NLRB can make bargaining unit determination); *but see Carpenters Local Union No. 1846 v. Pratt–Farnsworth, Inc.*, 690 F.2d 489, 518 (5th Cir.1982) (federal court can make bargaining unit determination if collateral to ERISA claim). The court, James concludes, should therefore have deferred to the NLRB's determination that the Funeral Home and WSL are not a single bargaining unit.[11]

The policy underlying the bargaining unit determination is to protect employees' right to choose their own representation:

It is clear that the primary motivation of the Board in making an independent unit determination in a single employer case is to protect the rights under section 7 of the NLRA, 29 U.S.C. § 157, of the employees of each of the subentities constituting the single employer to bargain collectively with representatives of their own choosing. Section 9(b) of the NLRA, 29 U.S.C. § 159(b), directs the Board to "decide in

---

11. We note that the Board did not actually hold that the Funeral Home and WSL are not an appropriate bargaining unit. On the contrary, the Board refused to certify anything less than a unit which included both entities' employees. It only held that WSL had not been, nor is it currently, part of the unit represented by the

Union at the Funeral Home. *NLRB* Case No. 13–RM–1657 (Unpublished Decision and Order). Thus even if the NLRB were required to make a determination of the appropriate bargaining unit in this case, it could be argued that it already has—in the Trustee's favor.

each case whether, in order to assure employees the fullest freedom in exercising rights guaranteed by (the NLRA), the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof ..."

*Pratt–Farnsworth, Inc.*, 690 F.2d at 507.

This rationale is applicable in single employer cases where a federal court must determine whether the entities at issue are represented by the same union or whether either is guilty of unfair labor practices against the other. *See Kansas City Southern Transport Co. v. Teamsters Local 41*, 126 F.3d 1059 (8th Cir.1997); *Lihli Fashions Corp. v. N.L.R.B.*, 80 F.3d 743 (2nd Cir. 1996); *UA Local 343 v. Nor–Cal Plumbing, Inc.*, 48 F.3d 1465 (9th Cir.1994); *Valley Eng'rs*, 975 F.2d 611 (9th Cir.1992); *Stardyne, Inc.*, 41 F.3d 141 (3rd Cir.1994); *Brotherhood of Teamsters, Local 70 v. California Consolidators, Inc.*, 693 F.2d 81 (9th Cir.1982); *Pratt–Farnsworth, Inc.*, 690 F.2d 489 (5th Cir.1982).

However, we cannot accept James's jurisdictional argument because nothing in the present case implicates representation or unfair labor practices. The only question here is whether the terms of the CBAs entered into by the Funeral Home apply to employees of WSL. Our Section 515 case law clearly establishes that we need not decide representational issues to impose liability for contributions to a multi-employer plan. *See Gerber*, 870 F.2d at 1153. In fact this court recently rejected James's reasoning in a case involving the same multi-employer pension fund. *Moriarty v. Larry Lewis Funeral Directors*, 150 F.3d 773 (7th Cir.1998). In *Lewis*, Larry and Gina Lewis ran a small funeral home which belonged to the FDSA. Under the terms of their CBA they made contributions to the Funds on their own behalf. The business failed and the Lewises went to work for a funeral home owned by Larry's sister. They continued to contribute to the Funds for themselves, but not for any other employ-

ee of the funeral home. Larry eventually became the owner of his sister's funeral home and the Trustee sued claiming that contributions were owed on behalf of all its employees. The district court dismissed the complaint, in part because it felt liability depended on a bargaining unit determination which only the NLRB had jurisdiction to undertake. *Id.* at 775. This court disagreed and, as to the NLRB jurisdiction issue, stated:

[W]e don't perceive its relevance to a suit under the collection provision of ERISA, 29 U.S.C. § 1132(e)(1). No employee wants to change bargaining representatives (or decertify a union); no one contends that an unfair labor practice has been committed; the NLRB therefore has no role to play. The Funds' claims are based on contracts rather than principles of labor law. Sometimes it is hard to tell whether a particular firm is a party to the contract; that is the problem this case poses, and it may be resolved without regard to the NLRB's principles of unit determination.

*Id.* at 776.

The present case involved a similar question of contract interpretation for the district court, and did not touch on any area of NLRB expertise. The court had to decide whether WSL employees were covered by the terms of the CBAs. The CBAs required contributions on behalf of all employees of employer members who performed livery services.[12] Once the court found that WSL and the Funeral Home were a single employer, and that WSL employees performed livery services, it could impose liability "in accordance with the terms and conditions of [the] ... agreement." 29 U.S.C. § 1145. The CBAs do not define coverage based on any collective bargaining unit and no such requirement need be inferred. *See Central States v. Joe McClelland*, 23 F.3d 1256, 1258 (7th Cir.1994). Therefore, as in *Lewis*, because the bargaining unit is not relevant to

---

**12.** Article I of the CBAs covering livery drivers states that "[t]he agreement applies only to Employees who are auto livery chauffeurs." Article V requires each employer member to contribute to Funds on behalf of "each Employee covered by this Agreement who is in the employ of such Employer member ..." Finally, Article XIII defines "Employee" as "[a]ny member of the Union who is in the employ of an Employer member who is an auto livery chauffeur."

liability, the court did not need to address that issue. 150 F.3d at 776.

Because no NLRB issue is present here, the district court's decision concerning WSL liability was well within its jurisdiction. 29 U.S.C. § 1132(a)(3);[13] 29 U.S.C. § 1132(e)(1);[14] *Martin v. Garman Construction*, 945 F.2d 1000, 1003–04 (7th Cir.1991) (holding that an ERISA claim brought for collection of contributions was in the exclusive jurisdiction of the federal court despite a prior NLRB decision).

■■■■ James's claim on the merits is no more convincing. He argues that because the Union was not the bargaining agent of WSL employees, it could not collectively bargain on their behalf, and consequently, the CBAs are invalid with respect to WSL. Our Section 515 case law, however, forecloses this argument. *Kroger*, 73 F.3d at 731 ( "[Under Section 515], a pension fund's reliance upon the terms of the CBA may not be thwarted ... by defenses that may defeat enforcement of the CBA between the employer and the union ..."). James's attack on the validity of the CBA does not affect his obligation to pay: "If the employer simply points to a defect in its formation—such as fraud in the inducement, oral promises to disregard the text, or the lack of majority support for the union and the consequent ineffectiveness of the pact under labor law—it must still keep its promise to the pension fund." *Gerber*, 870 F.2d at 1153. By the terms of the CBAs, an employer promises to make contributions for all its employees. Because James is the employer of all WSL's drivers under a single employer theory he must contribute on their behalf regardless of his objections to the validity of the CBAs themselves. *Id.* ("... nothing in ERISA makes the obligation to

contribute depend on the existence of a valid collective bargaining agreement ...").

Because neither of James's objections to the district court's decision regarding the WSL employees warrants a different conclusion, we see no reason to upset it on remand.

### Conclusion

While we agree with the district court's holdings regarding successor liability and contributions on behalf of WSL employees, we have come to a different conclusion regarding contributions on behalf of James himself. Because we do not consider James to be unambiguously included in the CBAs' definition of "employee," we must allow the district court to re-examine the meaning of the term taking the parties' extrinsic evidence into account. We therefore VACATE the district court's summary judgment and REMAND for further proceedings consistent with this opinion.

MANION, Circuit Judge, concurring.

I concur with the result and most of the court's analysis. I write separately to focus on a few aspects of successor liability.

In addressing the successor liability issue, the defendant chose to argue that *Atherton v. FDIC*, 519 U.S. 213, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997), had overruled *sub silentio* our prior decision in *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture*, 920 F.2d 1323 (7th Cir.1990). The court's opinion correctly concludes that this argument fails. And because the defendant waived arguing that *Artistic Furniture* does not apply in the first place, I agree that the defendant loses on this issue. But I emphasize that the defendant's waiver here does not resolve the question whether the rule of

---

**13.** "(a) Persons empowered to bring a civil action.
 A civil action may be brought—...
 ... (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan; ..."

**14.** "(e) Jurisdiction

(1) Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, fiduciary, or any person referred to in section ·1021(f)(1) of this title. State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under paragraphs (1)(B) and (7) of subsection (a) of this section."

*Artistic Furniture* would apply to these facts.

Svec & Sons Funeral Home and West Suburban Livery are not legal entities. They are simply assumed names. Prior to Elmer Svec's death, Svec & Sons was the assumed name under which Elmer conducted business as a "sole proprietorship." And that term is merely a short hand formula for describing someone who, perhaps with property he owns individually, does business as an individual, and not through a corporation or a partnership. The "sole proprietorship" label simply means Elmer owned the business individually. *Vernon v. Schuster*, 179 Ill.2d 338, 228 Ill.Dec. 195, 688 N.E.2d 1172, 1176–77 (Ill.1997) ("It is well settled that a sole proprietorship has no legal identity separate from that of the individual who owns it."). The name of the sole proprietorship is merely another name for "Elmer's." *See Main Street Development v. DeMicco*, 248 Ill.App.3d 392, 187 Ill.Dec. 851, 618 N.E.2d 442, 444 (Ill.App.1993) ("The designation d/b/a or doing business as[ ] generally indicates a sole proprietorship or some other situation where the named person owns or transacts business under an assumed name."); *Vernon*, 179 Ill.2d 338, 228 Ill.Dec. 195, 688 N.E.2d at 1177 (referring to d/b/a as "pseudonym" of the individual who uses it). Prior to Elmer Svec's death in 1987, "Svec & Sons" was an alias for Elmer Svec, an individual, and "West Suburban Livery" was an alias for co-owners James and Elmer, who were apparently acting as a common law partnership, although the record is unclear on this point. At his death, Elmer's property passed to his estate. The estate's property, thus, included Elmer's half interest in the partnership with James and all of the property Elmer owned and used in the business known as "Svec & Sons" (presumably including goodwill). Because the record regarding the probating of Elmer's estate is unclear, we have remanded for further proceedings regarding that issue. But we know that at some point Elmer's property passed in equal shares to his children, James and Sharon. Thus, it appears at this point that "Svec & Sons" is an alias for a partnership between James and Sharon and "West Suburban Livery" is an alias for a second partnership

between them. (Sharon's absence from this suit should be irrelevant because generally partners are jointly liable for the debts and obligations of the partnership; thus, James represents her interest here. *See Cook v. Department of Revenue*, 281 Ill.App.3d 171, 217 Ill.Dec. 224, 666 N.E.2d 893, 896 (Ill.App. 1996) (interpreting Illinois' Uniform Partnership Act).)

This brings us to the important distinction between the assets of a deceased in an estate and the assets of a corporation. If James and Sharon's two partnerships are successively liable for the contractual obligations of Elmer individually and of Elmer and James' partnership, they are so liable because the obligations passed with Elmer's property through probate and into James' and Sharon's possession. The facts here are significantly different than those encountered in *Artistic Furniture*, where one corporation had purchased all the assets of another corporation. *See* 920 F.2d at 1325. Both parties assume without discussion that if *Artistic Furniture* is still valid law—which it is—that its rule for corporate successor liability applies here. Because the parties have waived any other argument, we need not decide whether this assumption is valid, but I write separately to point out that this assumption is far from clear.

As stated in *Artistic Furniture*, the general common-law rule is that a corporation which purchases the assets of another corporation is not liable for the other corporation's obligations, but the general rule has four exceptions. 920 F.2d at 1325. We adopted a somewhat broader rule for corporate successor liability in ERISA cases because we had to balance the interest of effectuating the federal policy with the common-law interest in "the fluid transfer of corporate assets." 920 F.2d at 1326. We are not dealing with corporate assets here, so that common-law interest is not present. Neither party addressed the competing interests of individuals, estates, partnerships, corporations, and the state. Certainly at a minimum Illinois has an interest in the speedy and final resolution of estates. Moreover, the rule of *Artistic Furniture* was tailored for a fact setting involving a corporation's purchase of another's assets; thus, some of that analysis

would not apply here. For example, the rule of corporate successor liability is premised on the assumption that the purchaser could negotiate the acquisition price based on the potential liability. 920 F.2d at 1327. Obviously that reasoning has no application in an estate transfer, where the heirs took possession of the property by inheritance. The possibility of taking on the obligations of the deceased may determine whether the heir agrees to take property or refuses it, as Anne Svec did here. We should not presume as a matter of law that an heir knows of the obligations of the deceased under the CBA (as we do in the corporate purchase-of-assets setting), although under the facts here James must have known of Elmer's obligations.

The court does not decide today whether the appropriate rule for successor liability under these facts is an application of state probate law, some federal common-law rule based on probate law, or some other rule. At oral argument, counsel for the plaintiff suggested that the answer to this issue is simple: ERISA preempts state probate law because ERISA preempts everything. That is an inadequate answer. First, this is an exaggeration; ERISA does not displace all other law. Second, even if ERISA did preempt some conflicting state probate law, it would still have to be decided what the appropriate rule under ERISA was. These issues will be resolved when the litigants properly raise and argue them.